**Carolyn IANNUZZI, Individually and as Executrix of the Estate of Charles Iannuzzi, Deceased, Plaintiff,**

v.

**EXXON COMPANY, U.S.A., a DIVISION OF EXXON CORPORATION, Defendant.**

Civ. A. No. 82–1416.

United States District Court, D. New Jersey.

Oct. 4, 1983.

---

Joseph F. Maselli, Woodbury, N.J., for plaintiff.

John V. Fiorella, A. Colleen Malloy, Archer & Greiner, Haddonfield, N.J., Charles W. Matthews, Rene J. Mouledoux, Houston, Tex., for defendant.

## OPINION

GERRY, District Judge.

Plaintiff, Carolyn Iannuzzi, individually and as executrix of the Estate of Charles Iannuzzi, brought this action against defendant, Exxon Company, U.S.A., a division of Exxon Corporation ("Exxon") for an alleged wrongful termination of a franchise agreement between Charles Iannuzzi and/or Carolyn Iannuzzi and Exxon. Plaintiff contends that the termination violated both the Petroleum Marketing Practices Act (the "PMPA"), 15 U.S.C. §§ 2801–2806 (Supp. II 1978), and the New Jersey Franchise Practice Act (the "New Jersey Act"), N.J.Stat.Ann., 56:10–1 *et seq.* (West Supp.1982), and also constituted a breach of contract under state common law. This action is before the court on Exxon's motion for summary judgment.

## I. *Summary Judgment.*

On this motion for summary judgment, pursuant to F.R.Civ.P. 56, Exxon, the moving party, has the burden of demonstrating that there are no genuine issues as to any material facts and that it is entitled to judgment as a matter of law. *See Van Houten Service, Inc. v. Shell Oil Co.,* 417 F.Supp. 523 (D.N.J.1975), *aff'd without opinion,* 546 F.2d 421 (3d Cir.1976). Accordingly, the evidence presented to the court will be construed in favor of Mrs. Iannuzzi,

the party opposing the motion, *Continental Insurance Co. v. Bodie,* 682 F.2d 436 (3d Cir.1982); *Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402 (3d Cir.1981); *Mid-West Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573, 579 (3d Cir. 1979); and she will be given the benefit of all favorable inferences that can be drawn from it. *Peterson v. Lehigh Valley District Council, United Brotherhood of Carpenters and Joiners,* 676 F.2d 81 (3d Cir.1982). Furthermore, any facts asserted by Mrs. Iannuzzi which are supported by affidavits or other evidentiary material are regarded as true. *See Scott v. Plante,* 532 F.2d 939 (3d Cir.1976).

Here, in addition to the presumption to which plaintiff is entitled, the facts as they appear in Mrs. Iannuzzi's "Statement of Facts of the Case on Which There Exists Genuine Issues" in her original brief in opposition to the motion were not controverted by Exxon. *See* Reply Memorandum of Defendant Exxon in Support of Its Motion for Summary Judgment at 5. Exxon does, of course, dispute Mrs. Iannuzzi's characterization of the legal effect of those facts.

## II. *Background.*

Carolyn and Charles Iannuzzi owned property as tenants-in-common on which an Exxon service center was located in Malaga, New Jersey. (Deposition of Carolyn Iannuzzi, 12:1–4, 10–25.) During the first 15 years of the station's operation, which presumably began in 1948, Mrs. Iannuzzi's name appeared along with her husband's on several agreements. It also appeared more recently on a number of documents, including a "First Refusal Option to Buy" which continued in effect until the termination of the franchise (*id.* at 101:10–16; 106:1–16), a General Guaranty and a financial statement. Furthermore, her name appeared as owner-operator of the station on New Jersey sales licenses, joint income tax returns and checks used in the course of business operations.

Furthermore, during Mr. Iannuzzi's lifetime and after his death, Mrs. Iannuzzi performed numerous duties associated with the operation of the service center including: ordering products, maintaining credit card use, banking, bookkeeping, preparing and filing returns, paying bills and fees, paying employees and checking inventory. (Deposition of Charles Iannuzzi, Esq., 7:18–25; 8:1–5; 11:23–25, 17:18–25, 18:6–9, 19:12–14, 22:12–21 and 25:9–18; and affidavit of Carolyn Iannuzzi.) For purposes of this motion, the service center was run by both Charles and Carolyn Iannuzzi, with Charles being responsible for outside operations and Carolyn being responsible for inside operations.

Nonetheless, Mrs. Iannuzzi did not sign nor was she mentioned in the Sales Agreement entered into between Exxon and Charles Iannuzzi in February, 1976. Charles Iannuzzi and Exxon also entered into an Equipment Lease in June of that year. With the enactment of the PMPA in 1978, Mr. Iannuzzi was provided with statutory protection from arbitrary and discriminatory termination of his franchise by virtue of the Act.

The Sales Agreement formed the basis of the franchise as that term is defined in the PMPA. It provided in pertinent part as follows:

Breach and Termination: (a) It is agreed that if . . .

Buyer dies . . . then Seller may *at any time thereafter (immediately or otherwise)* terminate this contract by giving Buyer written notice of Seller's election to do so and this contract shall expire and come to an end on the date fixed in said notice as if said date were fixed herein for the expiration of the term thereof.

(Emphasis added.)

On June 16, 1980, Charles Iannuzzi died. Exxon was put on notice of his death no later than two weeks from the time of his death. (Deposition of Charles Iannuzzi, 37:5–22, 39:10–25, 40:1–8, 42:15–22, 44:20–25; Deposition of Carolyn Iannuzzi, 21:3–12, 109:1–5.) Exxon continued to deliver fuel products to the service station until May 4, 1981.

When Charles Iannuzzi died, the Department of Energy (the "DOE") regulations under the Mandatory Allocation Program prohibited the revision of supplier/purchaser relationships except by mutual consent of the parties. Former 10 C.F.R. § 211.9. The DOE supply obligation ran to the station location and not to the individual dealer; the regulations specifically provided "[t]he supplier/purchaser relationships required by this part *shall not* be altered by changes in ownership . . . ." Former 10 C.F.R. § 211.9(c) (emphasis added). Accordingly, Exxon had to continue to supply the service station here at issue as long as the regulatory program was in effect. *Trigg v. Texaco, Inc.,* 511 F.Supp. 447, 449 (S.D.Tex.), *aff'd,* 665 F.2d 350 (5th Cir. 1981); *Three J's Speed Shop, Inc. v. Mobil Oil Corp.,* CCH Business Franchise Guide 91 7898 (E.D.Pa., August 31, 1982).

On January 28, 1981, President Reagan issued Executive Order No. 12287 to exempt crude oil and refined petroleum products from price and allocation regulations. 46 Fed.Reg. 9,909, Jan. 30, 1981. The validity of the President's Executive Order was immediately challenged in the courts. *See Metzenbaum v. Edwards,* 510 F.Supp. 609 (D.D.C.1981), (court denied plaintiff's motion for preliminary injunction seeking to halt enforcement of the Order). In response to the President's directive, the Economic Regulatory Administration revoked all of the price and allocation regulations made unnecessary by the Executive Order. 46 Fed.Reg. 20,508, April 3, 1931. Section 211.9 was removed effective March 30, 1981.

In his affidavit in support of the motion, J.S. Carter, Manager of the Linden Retail District of Exxon, avers that "prior to the effective date of the removal of the DOE supply regulations, it was the Linden Retail District's practice to continue to supply motor fuel to a service station following the termination of its franchise relationship with a dealer, by death or otherwise, where it had a DOE mandated supply obligation, even though Exxon had not yet entered into any franchise agreement with a new dealer." Neither Mrs. Iannuzzi nor her son Charles Iannuzzi, Esq., her attorney and representative, was informed that Exxon was continuing to supply the station because of the DOE regulations. (Deposition of Carolyn Iannuzzi, 102:10–18, 110:23–25, 111:1–3, and affidavit of Carolyn Iannuzzi.)

Between Mr. Iannuzzi's death and Exxon's last delivery of fuel, a number of other incidents occurred. On or about February 13, 1981, two 2,000 gallon storage tanks which Exxon had leased to Charles Iannuzzi were taken out of service, because a customer who had purchased gasoline from those tanks had complained that the gasoline contained water. (Deposition of Carolyn Iannuzzi, 111:11–24, 132:18–21.) Exxon decided that the 25 year old tanks were not repairable and, as of April 20, 1981, decided not to replace them. *See* Letter dated April 20, 1981 from Richard V. Hansum, Esq. to Charles Iannuzzi, Esq. (Although replacement had earlier been recommended by J.S. Carter, one of Exxon's District Managers, *see* Internal Memorandum dated February 17, 1981 from D.J. Dragan to Ed.)

In response to a previous telephone call from Charles Iannuzzi, Esq., T.M. Burns, Exxon's Field Sales Manager, sent him a letter dated March 6, 1981, in which he stated that Exxon would "prefer to negotiate a *mutual cancellation* of these documents [Sales Agreement and Equipment Lease]." (Emphasis added.) Between March 6, 1981 and April 20, 1981, Exxon and Charles Iannuzzi, Esq., exchanged correspondence regarding the supposed leak in the gasoline storage tanks, gasoline supply problems and the possibility of Exxon buying out the contracts for $6,000.00.

Finally, by letter dated April 20, 1981, Richard Hansum notified Charles Iannuzzi, Esq., that Exxon deemed "the Sales Agreement, as well as any franchise relationship with respect [to the subject] location terminated effective May 8, 1981 for the reason that Exxon's dealer at this location has died." He also informed him, among other things, that the letter itself was to constitute the five days' prior written notice which Exxon was required to give under

the Equipment Lease in order to terminate it. He also encouraged Mr. Iannuzzi to accept $6,000.00 in return for a Mutual Termination and Release through May 8, 1981.

Mr. Iannuzzi rejected the offer and informed Exxon that his mother considered it to have repudiated its agreements and would take steps to mitigate her damages. Certified Letter dated April 29, 1981, from Charles Iannuzzi, Esq., to Richard V. Hansum, Esq.

On May 6, 1981, J.S. Carter telephoned Mr. Iannuzzi and offered Carolyn Iannuzzi the opportunity to enter into a franchise relationship with Exxon which would involve only a Sales Agreement. This offer was confirmed in a letter dated May 7, 1981, in which Mr. Carter stated that because of economic considerations, Exxon did not want to replace the storage tanks but was willing to enter into a Sales Agreement with Mrs. Iannuzzi. Mr. Iannuzzi rejected that offer on his mother's behalf for at least two reasons:

1. "In my correspondence with you [Mr. Hansum] and Mr. Burns, I emphasized the fact that my mother had a binding relationship with Exxon as a result of the 33 year period that she and my father had dealt with Exxon and that there was no valid reason to terminate that relationship within the purview of the sales agreement and the Petroleum Marketing Practices Act"; and

2. "In any event, after the events of the past year, I see no reason why my mother should consider obligating herself with a company who repudiates existing sales agreements with her, equipment leases and federal statutes."

Certified letter dated May 12, 1981 from Charles Iannuzzi, Esq., to Richard V. Hansum, Esq.

Although Mr. Iannuzzi stated in his May 12th letter that he and his mother were attempting to find someone to lease the station, on May 11, 1981, Carolyn Iannuzzi had already leased the service station premises to Levari Oil Company. (Deposition of Charles Iannuzzi, Esq., 85:11–20.) At her deposition, she stated that she preferred to rent the service station premises rather than to operate it under a franchise with Exxon. (Deposition of Carolyn Iannuzzi, 113:18–19, 120:22–24, 131:12–14.)

On May 5, 1982, Mrs. Iannuzzi instituted this action. Levari Oil breached its agreement with her in September of 1982.

III. *Discussion.*

A. *Plaintiff as Personal Representative of Charles Iannuzzi's Estate*

1. *Termination Under the PMPA*

As the executrix of Charles Iannuzzi's estate, Carolyn Iannuzzi brought this action claiming that Exxon wrongfully terminated its franchise relationship with Charles Iannuzzi after Mr. Iannuzzi's death.

The PMPA does not directly address the issue of whether the death of a franchisee is a proper ground for termination of a franchise relationship, but it has been construed to allow for termination or nonrenewal upon the death of the franchisee. *Kostantas v. Exxon Company, USA,* 663 F.2d 605 (5th Cir.1981), *cert. denied,* 456 U.S. 1009, 102 S.Ct. 2302, 73 L.Ed.2d 1305 (1982); *Blankenship v. Knox Oil Company,* 548 F.Supp. 789, 791 (E.D.Tenn.1982); *Lanham v. Amoco Oil Company,* 481 F.Supp. 405 (D.Md.1979); *Endicott Sales and Service v. Mobil Oil Corporation,* No. 79–1491–G (D.Mass. July 9, 1980) (transcript of the proceeding submitted to the court).

In *Kostantas,* the case most nearly on point, the plaintiff, the surviving spouse and personal representative of the estate of a deceased Exxon dealer,[1] filed suit against

---

1. In *Lanham,* the plaintiff was also the surviving spouse and personal representative of a deceased dealer. In *Endicott,* the dealer's widow unsuccessfully attempted to enjoin the termination by contending that a corporation and not the decedent was the franchisee (dealer). In *Blankenship,* the plaintiff died after the complaint was filed. The plaintiff's personal representative was substituted as plaintiff.

Exxon under the PMPA alleging that the service station franchise was wrongfully terminated upon her husband's death. Termination occurred almost immediately upon the franchisee's death. The Court of Appeals for the Fifth Circuit rejected Mrs. Kostantas' argument and held:

Nothing in the Act . . . requires a franchisor to create a permanent estate of inheritance in the franchise, thus disabling itself from selecting those with whom it wishes to deal. Such a result is foreign to the manifest purpose of the Act, to regulate the relationship between persons who have chosen to associate themselves.

663 F.2d at 606. The Court of Appeals concluded that the PMPA does not prohibit a *contractual provision* providing for termination upon the dealer's death and affirmed the district court's order dismissing the complaint for failure to state a claim upon which relief could be granted. The provision at issue here is identical to the provision considered in *Kostantas,* 663 F.2d at 606, n. 1. *See* Sales Agreement, paragraph 17.

■ This court agrees that a franchise may be terminated upon the death of the franchisee without violating the PMPA.

Plaintiff attempts to distinguish her situation from the other cases by arguing that Exxon's delay in raising Charles Iannuzzi's death as the terminating event constituted a waiver by Exxon of its possible assertion. Exxon was informed of Mr. Iannuzzi's death in June of 1980 and did not raise his death as a reason for termination until April 20, 1981.

The narrow issue which the court is presently addressing is whether Exxon violated the PMPA as against Mr. Iannuzzi. It can be argued, first of all, that the PMPA is not applicable to terminations upon death. "[T]he Act is designed to protect franchisees from arbitrary and discriminatory termination or non-renewal of a franchise for failure to comply with the marketing policies of a franchisor. S.Rep. No. 95–731, 95th Cong., 2d Sess. 15, *reprinted in* [1978]

U.S.Code Cong. & Ad.News, 873, 874." *Kostantas,* 663 F.2d at 606.

But assuming that the Act is applicable, by construing 15 U.S.C. § 2802(b)(2)(C) to provide that death is a "reasonable" ground for termination, thus, at least arguably calling into question the applicability of the notice provision, *see Lanham v. Amoco Oil Co.,* 481 F.Supp. at 407, that safeguard is inapplicable when death is the terminating event. As the *Kostantas* court noted:

[T]he Act defines the types of events that require notice, and those are events about which there might be some *factual* dispute to which the franchisee could respond before termination or non-renewal. 15 U.S.C. § 2802, § 102(b)(2). For example, whether a person is 'severely disabled' is a fact question, and the notice requirements give the franchisee a chance to respond with evidence that he is not so disabled.

663 F.2d at 606.

No such opportunity is necessary where death is the predicate to termination. Therefore, it does not make sense to find that a delay in notifying a deceased franchisee's family could lead to a waiver of the right to terminate and thus to a violation of the PMPA.

■ Furthermore, this court concludes that a franchise agreement is a contract of a personal nature and in the absence of a provision that it survives the death of the franchisee, it terminates upon the death of the franchisee. *See Siesel v. Mandeville,* 140 N.J.Eq. 490, 55 A.2d 167 (1947); *Cf.* 17 Am.Jur.2d § 413 at 864–866. This court believes that franchisors have the right to choose those whom they will treat as franchisees and to whom they will be obligated under their agreements and statutes in light of the fact that franchisees are bearers of the franchisors' trademarks in the world of commerce. This conclusion renders the actions taken by Exxon after Mr. Iannuzzi's death a bit absurd—the formal statement of termination coming ten months after the death of Mr. Iannuzzi—but those actions (or actions like them) may go to whether Exxon (or any other fran-

chisor) entered into a new agreement, be it a franchise agreement or some other kind of distribution agreement, with the person (or persons) continuing to run the service station.

This court refuses to hold that franchises are estates of inheritance simply because Exxon's conduct in this case is not above reproach. Those who continue to run service stations after franchisees die have a responsibility to secure their positions. Accordingly, the court declines to substitute Mrs. Iannuzzi as Mr. Iannuzzi's personal representative in the franchise agreement as it stood at Mr. Iannuzzi's death and to find that the termination ten months after his death was wrongful.

### 2. The Termination of the Equipment Lease Does Not Provide a Cause of Action Under the PMPA

It has already been decided that no violation of the PMPA resulted from Exxon's termination of Charles Iannuzzi's franchise. Under the circumstances, it is unnecessary to decide whether the Equipment Lease could technically have been considered a part of the franchise.

### 3. Plaintiff as Representative of Her Husband's Estate Has No Claims Cognizable Under the New Jersey Act or New Jersey Common Law

In the area of terminations and non-renewals of petroleum marketing franchises, the PMPA preempts the field:

(a) To the extent that any provision of this title applies to the *termination* (or the furnishing of notification with respect thereto) of any franchise, or to the *nonrenewal* (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect *to termination* (or the furnishing of notification with respect thereto) of any such franchise or *to the nonrenewal* (or the furnishing of

notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this title.

■ Claims for unlawful terminations of franchises are cognizable only under the PMPA and not under the New Jersey Act or common law. *Meyer v. Amerada Hess Corporation,* 541 F.Supp. 321, 332 (D.N.J. 1982); *Ricco v. Shell Oil Company,* 180 N.J. Super. 399, 403, 434 A.2d 1151 (Ch.Div. 1981).

### B. Plaintiff Individually

### 1. Charles Iannuzzi Alone Was Exxon's Franchisee Prior to His Death for Purposes of the PMPA

There is no genuine issue of material fact in dispute regarding Carolyn Iannuzzi's status as an Exxon franchisee prior to her husband's death: at all times material to this issue, Exxon had but one franchisee at the Malaga service station, Charles Iannuzzi.

■ Although the statute defines a franchise in terms of a trademark, in order to be a franchisee under the PMPA, one must enter into a contract with the franchisor relating to the sale or distribution of motor fuel. *Bsales v. Texaco, Inc.,* 516 F.Supp. 655, 661 (D.N.J.1981).

■ Mr. Iannuzzi alone signed the relevant written agreement with Exxon. The Sales Agreement between him and Exxon constituted the franchise agreement for purposes of the PMPA. 15 U.S.C. § 2801(1)(B)(ii). Therefore, he was Exxon's franchisee.

Carolyn Iannuzzi was aware that in the 1950's her name was taken off the Sales Agreement and Equipment Lease that her husband had with Exxon. (Affidavit of Carolyn Iannuzzi at ¶ 7.) She testified, "All I know is when we opened the station both names were there. When they removed it, my signature was never requested. I didn't like it, but *I ignored it.*" (Deposition of Carolyn Iannuzzi at 102:11–15, emphasis

added.) None of the documents to which plaintiff refers can be construed to create a franchise between Mrs. Iannuzzi and Exxon.

The fact that on December 9, 1969 Carolyn Iannuzzi executed the "First Refusal Option to Buy and Lease" with Exxon's predecessor in interest is irrelevant. Her name appeared on the option simply because she owned the property subject to the option as a tenant-in-common with her husband. (Affidavit of Carolyn Iannuzzi at ¶ 6.) It merely provided that prior to leasing or selling the property, the Iannuzzis would offer to sell or lease it to Exxon at the same price and terms; and it specifically provided that "[b]oth Owner and *Spouse* Must Sign."

Similarly irrelevant is the Guaranty which Mrs. Iannuzzi signed in April, 1965. As of November 27, 1973, Exxon informed her that it considered the document a guaranty by her in favor of Humble Oil and Refining Company, Exxon's predecessor in interest, covering the debts of the subject debtor, Charles Iannuzzi. *See* Letter dated November 27, 1973 from Exxon to Carolyn Iannuzzi.

The fact that Charles and Carolyn Iannuzzi filed joint tax returns has no relevance to this proceeding; nor does the manner in which Mr. Iannuzzi obtained certain licenses from the State of New Jersey. Furthermore, Exxon's attempt to obtain a "Mutual Termination and Release" from Mrs. Iannuzzi ten months *after* her husband's death does not tend to establish that she was Exxon's franchisee *before* her husband's death where he was clearly the party who entered the written agreement memorializing the franchise.

Mrs. Iannuzzi does not argue that she had any oral agreement with Exxon prior to her husband's death.[2] She does argue, however, that she was a joint venturer with her husband and assisted him in operating the station. Neither of those considerations raises an issue concerning Mrs. Iannuzzi's relationship with Exxon in regard to the supply of branded motor fuel.[3]

2. *For Purposes of the PMPA, Carolyn Iannuzzi Did Not Become A Franchisee of Exxon After Her Husband's Death*

■ For purposes of the PMPA, a franchise contract may be either written or oral. 15 U.S.C. § 2801. To the extent that Mrs. Iannuzzi relies upon written agreements between the parties, including the Option to Purchase which was signed by her and remained in effect until the date of termination, to argue that a written franchise agreement between her and Exxon existed after her husband's death, the court finds her arguments unpersuasive. See page 10, *infra*. None of the documents to which plaintiff has drawn the court's attention could constitute a franchise agreement as that term is defined in the PMPA.

Mrs. Iannuzzi does not argue that an oral agreement between her and Exxon was reached after her husband's death, but instead argues that the course of conduct between the parties was sufficient to establish a franchise. No court to date has accepted this argument in the absence of a prior existing franchise agreement between the parties.

In *Three J's Speed Shop, Inc. v. Mobil Oil Corporation,* CCH Business Franchise Guide 917898 (E.D.Pa., August 31, 1982), the court held that the *conduct* between the parties failed to establish a franchise, in part, because "the PMPA by its terms requires there to be a written or oral agreement to supply motor fuel in order to establish a franchise." *Id.* at 13,378. This court

2. The Sales Agreement provided in pertinent part:

> 20. ENTIRE AGREEMENT: This writing is intended by the parties to be the final, complete and exclusive statement of their agreement about the matters covered herein. THERE ARE NO ORAL UNDER-

STANDINGS, REPRESENTATIONS OR WARRANTIES AFFECTING IT.

3. Furthermore, for purposes of this issue, the relationship between Charles and Carolyn Iannuzzi is legally irrelevant. The PMPA does not include the spouses of retailers. 15 U.S.C. § 2801.

agrees that in the absence of a written or oral contract, no *franchise* exists for purposes of the PMPA. Here when Exxon made an oral offer to Mrs. Iannuzzi's son to enter into a sales agreement on May 6, 1981, which offer was later confirmed in a letter, it was rejected by Mr. Iannuzzi on his mother's behalf.

In *Wisser v. Texaco, Inc.*, 529 F.Supp. 727 (S.D.N.Y.1981), the court held that a non-compelled course of dealing between parties to a previous franchise agreement could support the existence of a *franchise relationship*.[4] The existence of the "franchise relationship" recognized under the Act is what calls the PMPA renewal provisions into play. Here there is no possibility of a "franchise relationship" existing between Mrs. Iannuzzi and Exxon after Mr. Iannuz-zi's death, because the court has determined that they were *never* parties to a franchise agreement prior to his death.

 To the extent that either *Three J's Speed Shop* or *Trigg v. Texaco*, 511 F.Supp. 447 (S.D.Tex.1981)[5] can be read to suggest that an *implied* franchise agreement can be created between parties in the absence of a franchise relationship between those same parties, this court disagrees with them. The PMPA clearly and unambiguously provides that the contracts be either written or oral; it does not include "implied" contracts. Therefore, the public is on notice that in order to take advantage of the protections afforded by the Act, one must enter into the required kind of agreement. In the absence of a written or oral agree-

---

4. To complicate matters further, the PMPA distinguishes between a "franchise" and a "franchise relationship." A "franchise" has already been described. The PMPA defines the term "franchise relationship" as "the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee *which result from the marketing of motor fuel under a franchise.*" 15 U.S.C. § 2801(2) (emphasis added).

According to the court in *Three J's Speed Shop:* The reason the PMPA distinguishes between the termination of a "franchise" and the failure to renew a "franchise relationship" is explained in the legislative history.

The term [franchise relationship] is defined to cover the broad relationship which exists between a franchisor and a franchisee by reason of the franchise agreement. The term is utilized for two reasons. First, in the renewal context, the contract which constitutes the franchise may no longer exist and the term "franchise relationship" is utilized to avoid any contention that because the "franchise" does not exist there is nothing to renew. The renewal provisions of the title address the renewal of the relationship between the parties rather than the specific rights or obligations of the parties under the franchise agreement. Second, because the title contemplates changes in the specific provisions of the franchise agreement at the time of renewal, the title requires renewal of the relationship between the parties as distinguished from a continuation or extension of the specific provisions of the franchise agreement. Use of the narrower term "franchise" in this context could raise unintended questions regarding the ability of the franchisor to comply with the renewal obligations of the title by offering a franchise agreement which dif-

fers in any particular from the expiring franchise.
S.Rep. No. 95–731, 95th Cong. 2d Sess. 30, reprinted in [1978] U.S.Code Cong. & Ad.News 873, 888. The use of the term "franchise relationship" affords protection to a franchisee after expiration of the franchise/contract and also enables the franchisor to alter the terms of the franchise/contract without affecting the obligation to supply motor fuel provided therein.

5. In *Trigg,* Texaco was found to have involuntarily continued distributing gasoline to Mr. Trigg after it had sought to terminate its consignment agreement with him. (There was no "franchise relationship" between the parties as the court reads the case.) At the time it sought to terminate the consignment agreement, the DOE regulations under the Mandatory Petroleum Allocation Program prohibited the revision or termination of supplier/wholesale purchaser relationship except by mutual consent of the parties, 10 C.F.R. § 211.9 (1980). Texaco clearly communicated to Trigg that it was supplying gasoline only because of the DOE regulations and ceased supplying Trigg as soon as the regulations were lifted.

The court found that no contract existed because Texaco was forced to supply gasoline to Trigg and so informed. It did not hold that a course of dealing cannot establish a franchise agreement.

In *Three J's Speed Shop,* the court held alternatively that "nothing in the conduct of Mobile Oil Company ... would establish the intent to enter into a franchise with Three J's ...," *id.* at 3,378, the implication being that if there were evidence of an intent to enter into an agreement such an agreement could be established.

ment entitled to statutory protection as a "franchise" under the PMPA, a party who contends that an agreement was formed by the parties' conduct may be able to look to state law for protection. But even absent an available state remedy, this court declines to transform the PMPA into a panacea for all ills suffered by those dealing with motor fuel distributors.[6] Accordingly, Exxon is entitled to summary judgment with respect to this aspect of Count I.[7]

### 3. *Plaintiff Has No Claims Cognizable Under the New Jersey Act*

The New Jersey Act requires a written contract for the creation of a franchise. 56:10–3(a). Mrs. Iannuzzi did not have a *written* contract with Exxon individually. Therefore, Exxon is entitled to summary judgment as to this aspect of Count II of the Complaint.

### 4. *Plaintiff Has No Claim Cognizable Under New Jersey Common Law*

Although Mrs. Iannuzzi clearly did not have a "franchise" with Exxon as that term is defined under the PMPA and the New Jersey Act, it could be argued that an implied agreement of some sort was created between the parties after Mr. Iannuzzi's death given a consideration of all the circumstances. However, neither this court nor a jury need reach this issue, because to sustain a claim of a breach of such an agreement, plaintiff must prove damages, and no damages were suffered by plaintiff according to her own admission. At her deposition, she stated that she preferred renting the service station to someone else rather than operating it under an Exxon franchise. Under the circumstances, this court cannot imagine what damages plaintiff suffered by having her own way.

**6.** Mrs. Iannuzzi also argues that Exxon should be estopped from denying the existence of a franchise with her. She has not provided the court with any estoppel theory; but more important, in light of the court's reasoning above, it would not estop Exxon from denying the existence of a franchise agreement under the PMPA.

Summary judgment will be entered in favor of Exxon. The accompanying order will be entered.

**7.** Given the court's finding that Mrs. Iannuzzi was not individually a franchisee of Exxon's under the PMPA, it is not necessary to decide whether the Equipment Lease could technically be considered a part of *her* franchise with Exxon.