**Luis Alfredo SANTIAGO–
SEPÚLVEDA, et al.,
Plaintiffs**

v.

**ESSO STANDARD OIL COMPANY
(PUERTO RICO), INC., et al.,
Defendants.**

Civil Nos. 08–1950 (CCC), 08–1986(CCC), 08–2025(CCC), 08–2032(CCC), 08–2044(CCC).

United States District Court,
D. Puerto Rico.

Oct. 18, 2008.

---

*OPINION AND ORDER*

JUSTO ARENAS, United States Chief Magistrate Judge.

These consolidated actions are brought by plaintiffs, most of which are non-trial

franchisees of defendant Esso Standard Oil Company (Puerto Rico), Inc., and who lease and operate Esso gasoline retail outlets throughout Puerto Rico. In March 2008, Esso announced it was selling its assets including the franchise agreements, withdrawing from the Puerto Rico market, and terminating their franchise agreements effective September 30, 2008. Intervenor-codefendant Total Petroleum Puerto Rico Corporation was then announced as the prospective franchisor. Unhappy with this decision, plaintiffs seek injunctive relief, declaratory judgment and damages arising under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801–2806.

## BACKGROUND

Esso Standard Oil Company has sold gasoline in Puerto Rico under the Esso brand for over a hundred years, one-hundred and eighteen to be exact. At present, there are 161 Esso service stations that sell Esso gasoline on the island. The stations are operated by 131 independent franchise dealers. (Docket No. 42–4 at 21, at 2, ¶¶ 4–5.) Esso has entered into a franchise agreement with each of the independent operators. Esso owns the land on which most of the franchisees are located. The franchise agreement in each case is highly regulated and governed by the Petroleum Marketing Practices Act.

After months of consideration and analysis, Esso decided to leave the retail market in Puerto Rico. Esso announced its decision to its to franchisees on March 17, 2008. Prior to that time, Esso had identified Total Petroleum as a viable buyer of its Puerto Rico assets. Esso and Total negotiated the sale of Esso's Puerto Rico assets for about a year.

Plaintiffs originally sought a preliminary injunction to continue the franchise agreements during the pendency of these action. Plaintiffs in Civil 08–2032 and 09–2044 have entered into agreements with Total Petroleum so that such agreements take the place of the express grant of preliminary injunction. Those agreements become effective November 1, 2008 and are valid for three years. At the same time, those particular plaintiffs, Esso and Total stressed that none of the parties were waiving any rights accrued to date, or that may accrue in the future under the PMPA, or other statute. I maintain strict supervisory power over those cases.

## EVIDENTIARY HEARING

At the evidentiary hearing held on September 30, October 1 and 2, 2008, plaintiffs in these five consolidated cases were represented by Juan H. Saavedra–Castro and Carlos E. Montáñez, Esqs., defendant Esso by Ángel E. Rotger–Sabat and Christina Sarchio, Esqs., Total Petroleum by Lee Sepulvado–Ramos and Luis G. Parrilla–Hernández, Esqs.[1] While the hearing began under the rubric of 15 U.S.C. § 2503(b)(2), plaintiffs proposed consolidating the preliminary and permanent injunctions. *See* Fed.R.Civ.P. 65(a)(2); *Aponte v. Calderón,* 284 F.3d 184, 190 (1st Cir.2002). Esso later agreed to the consolidation. The requests for provisional remedies having been thus withdrawn, only the ultimate issues remain to be resolved.

The defense presented the testimony of Estuardo Trujillo, who has been the president of Esso Standard Oil Company (Puerto Rico) for 4½ years, and has been with the company for over 18 years. He explained that Esso is in the fuel marketing business, importing, storing, and distribut-

---

**1.** Plaintiffs in case Nos. 08–2032 and 08–2044 did not participate in the hearing. See Dock- et No. 81.

ing fuel products to 161 retail service stations. Of those 161 service stations, two-thirds of the properties where the service stations are located are owned by Esso and one-third are dealer-owned or owned by a third party. Esso also has industrial and wholesale customers and distributes fuel to manufacturers and to government agencies, as well as aviation fuel to commercial aviation customers. Mr. Trujillo oversees the general business and is responsible for company sales.

Esso Standard Oil began operations in Puerto Rico in 1890. Because Puerto Rico produces no gasoline, all gasoline is imported. Esso has two terminals, one in Cataño and one on the south side of the island at Corco in Guayanilla, where storage tanks are located. The motor fuel is imported from St. Croix by Hovensa, at the rate of one ocean-going tanker a week, and these are unloaded at the Corco terminal or at the Cataño terminal, where the fuel is placed in loading tanks. Esso leases the terminal facilities from the Puerto Rico Land Authority in Cataño, and from Corco on the south coast. From the loading tanks, the fuel is discharged, flowing through lines to the trucks designed to transport and transfer fuels. Once loaded, those tanker trucks then proceed to transport the fuel and unload at the franchise service stations, where pumps send the fuel into underground tanks through discharge lines, from which underground tanks the fuel is then pumped for ultimate delivery to retail customers. Esso itself does not own these delivery trucks. La Cooperativa de Camioneros is the owner of those trucks and Esso has a basic vendor agreement with them.

Mr. Trujillo noted that Esso entered into a PMPA contract with each dealer and that there may be some differences in details, such as the rent, but that the format is standard. The lease contract makes provisions for termination, such as Esso's having to inform the dealer of termination 180 days before the date of termination, and the prospective purchaser of the contract (in this case Total) must offer nondiscriminatory terms, which must be similar, although not identical, to others being offered by Total. In relation to trial franchisees, they receive the same franchise contract but it is for one year and it is a trial franchise because Esso is testing the newcomer to see if he has the appropriate skills to be a franchisee.

Specifically, Mr. Trujillo related discussing the franchise contract with Ms. Enid Fonseca–Marrero, whose brother is Mr. Rafael Fonseca–Marrero. Mr. Fonseca became an Esso dealer in 2007, and his sister was a manager for the site. Although she operated the station, the dealer or franchisee was actually Mr. Fonseca. At the end of 2007, she came to Esso with her father and asked to be the dealer of the site, although her brother's name was on the franchise agreement. Esso said no, because Esso does not intervene in family matters. She later reached an agreement with her brother and was then accepted as an Esso dealer. Referring to Exhibit A (lease agreement), Mr. Trujillo noted that it was a trial contract, signed by Ms. Fonseca, which contained the terms of termination.[2] Referring to Ms. Fonseca, her husband Julián Hernández–Pérez, and the conjugal partnership they comprise, Mr. Trujillo noted that they are married and that she was the franchisee under the PMPA PL 95–297. They are under a trial franchise, that is, they are provisional franchisees. No letter was sent to Julián Hernández–Pérez since the letter was sent

2. Exhibit A, at 42, reflects it was signed on February 27, 2008. The effective date of the lease is March 15, 2008. See Ex. A, at 6.

only to the dealer of record according to the PMPA, Enid Fonseca–Marrero. See Ex. A, at 35, § 14.1.

Esso explored the possibility of leaving Puerto Rico during the end of 2006 and in 2007. Beginning in mid–2007, Esso negotiated with Total as a prospective buyer of its assets, resulting in the decision to sell. The decision to sell the assets of Esso was based upon Esso's financial losses for the last five years. Esso looked for a buyer both in and out of the country and found Total. Thus, on March 7, 2008, the Board of Directors of Esso, composed of two other persons and Mr. Trujillo, authorized the sale of the company.[3] Before that time, Esso had not made the decision to leave. The reason for the decision to sell to Total was that it was a big, solvent company with a good reputation and among other factors, Total was willing to accept most of the Esso employees, and also willing to offer a nondiscriminatory franchise contract.

The announcement of the sale was made on March 10, 2008. The Esso employees were told of the sale, as well as the reasons for the decision. Esso also started to communicate the decision to dealers and customers, and sent them a letter via certified mail informing them of the termination. Furthermore, the territory manager personally handed the letter to the dealers and the franchisees signed the letter (acknowledging receipt). See Ex. D. The letter also informed of Esso's decision to sell its assets under the PMPA to Total. For example, the letter to Ms. Fonseca was sent by certified mail with receipt requested. See Ex. C. The same letter to Enid M. Fonseca–Marrero was hand-delivered; she signed it, with the date received.

A press release of the decision was made and Esso also communicated the decision to government agencies and the Governor. Esso notified the Governor and main agencies that work with Esso, such as the Puerto Rico Land Authority, the Puerto Rico Ports Authority, the Environmental Protection Agency, and the Federal Trade Commission. Also informed was the Puerto Rico Department of Justice. In relation to the Governor, Esso sent him correspondence confirming that Esso was leaving, and attached to that correspondence the notifications to the dealers. This correspondence was sent by certified mail to the Governor, as reflected by a stamp from the Governor's office.

Total later engaged the franchisees by offering them a contract similar to the one in place with other Total franchisees in Puerto Rico, as reflected in Exhibits F1 (sales and supply contract) and F2 (lease agreement). These are the contracts being offered to dealers such as to Héctor Gierbolini. See Ex. G1 and Ex. G2. Exhibit G1 is Mr. Gierbolini's Total supply contract and Exhibit G2 is his Total lease contract, although the dealer name is not on the contract.[4] The date of this contract is June 24, 2008 and reflects Total's agreement with the dealer. When one compares Exhibits F1 and F2 with Exhibits G1 and G2, they are almost the same, and look the same. The clause numbers match.

As to a trial franchisee there is typically a one year term.[5] Total offered the trial franchisees the same contract or a similar contract. To date, seventeen dealers have accepted the Total franchise contract.

Mr. Trujillo discussed the steps taken to inform the termination, such as sending a

---

3. Exhibit B: Consent to enter into a sale and purchase agreement.

4. None of the plaintiffs have signed these the proposed Total contracts.

5. 15 U.S.C. § 2803(b)(1).

standard letter, but also visits and making personal phone calls, informing the franchisees what was happening with the sale to Total. Also notified were the Environmental Quality Board, the military, and the United States Coast Guard, with which there was a lot of communication. He noted that Total is required to file a lot of documentation to be able to operate.

Esso also told its suppliers and vendors that effective September 30, it was leaving the local market. Esso thus cancelled maintenance and repairs contracts, contracts with its haulers, and also told them it was leaving on September 30. Those haulers are the ones that would transport Esso's fuel to the different customers. There were a total of 18 contracts with key suppliers, such as Capeco (provider of turbo fuel at the airport) and Corco. Provisions have been made for office space being assigned to Total, which space is located next to Esso.

Total has agreed to hire 75% of Esso's Puerto Rico workforce. The other Esso employees received support and outplacement services from a company hired by Esso in order to prepare the employees to look for another company or to go into retirement. Support was also offered for employees going to Total, as well as severance packages with a premium. Of the 75 employees, 59 were going over to Total and 16 would be going elsewhere or would be retiring. Some have left already.

The related procedure reflects the goal of minimizing the interruption of work while the franchisees continue to buy products. In mid-August, 2008, Esso started a partial disbranding (removing the brand name from the service stations). It began taking down the small signage from the pumps and canopies, leaving the Esso oval as the main visual form of identification.

The termination of the Esso franchises was to be October 1, 2008 but that was changed to the end of October once they learned of the lawsuit and the preliminary injunction hearing set for September 30. Esso could not risk having a decision to close its operations on that date so given the uncertainties, Esso delayed the closing. Meanwhile, Esso has lost critical personnel including the airport supervisor, the Human Resources person, who kept people happy, and about half of Esso's sales force. The supply area also "took a hit". Esso has had to renegotiate with the supplier of fuel. Thus it has made spot contracts which are unlike long-term contracts. The short-term product is not guaranteed, and there is a risk of not having a supply all the time, and then to pay much more for the same. Esso pays much more at Corco because of having become less important and competitive to it. Because Esso has to pay more, it has to raise prices to the customers, who resent the raise. Short-term contracts are at the bottom of the list for the supplier. Thus Esso cannot guarantee product supply in times of emergency, such as hurricanes, for the 161 sites.[6] Esso remains a supplier for the government, police, and ambulances, but Mr. Trujillo noted that it would be difficult to go beyond October 31, 2008. It is also hard to secure short-term contracts with the supplier beyond October 31. Mr. Trujillo said he did not know if Esso could get supplied next month. Insecure employees are leaving; remaining employees are unfocused; handling fuels for airplanes is dangerous work so the people side of the job is becoming hard to manage; it is impossible to keep the standard that the Esso people need for the management of safety; vendors have also dismissed people because Esso said it was leaving. There are also risks involving leaks and danger

6. At this writing Hurricane Omar had just skirted the island.

to the environment, as well as high risks at the airport and the terminals. Because of the transport of fuel and fuel for airplanes, expertise is needed. Not having expert personnel makes it impossible to keep the level of service and of safety guaranteed.

In relation to reasonable contingencies, Mr. Trujillo was aware he had to comply with the PMPA notice requirement, and that Total had to offer a nondiscriminatory contract, something that it committed to him it would do. He has never seen the Total franchise contract proposed to the Esso franchisees, and did not consider that as a risk. He was told that Total would offer a nondiscriminatory contract and counted on the Total contract being nondiscriminatory. There was no Plan B. Mr. Trujillo noted he was supposed to notify all the franchisees, and that there was no contingency if same were not notified.

As a member of the three-person board of directors of Esso Puerto Rico, he was given instructions and authorized by the board to proceed on March 7, 2008 to notify the sale of Esso assets. While the board of directors authorized the sale, Mr. Trujillo did not know the details. He did not know when the sole shareholder of Esso Puerto Rico made the decision to sell. A lawyer drafted the resolution. Mr. Trujillo did not know when, for example, the shareholder tentatively approved the sale of the assets.

After the decision was announced, there was a partial de-branding process and the public was notified that Total would be operating. See Ex. 2 and Ex. 3.[7]

Mr. Trujillo noted that 2/3 of the properties are owned by Esso and the other 1/3 are not. Those are dealer-owned. When the transaction was completed as to the 161 service stations, all of Esso's assets would be sold. The lease contract would be assigned to Total by Esso, and the owner of the land where the service station is located would then lease the land back to Total. According to Mr. Trujillo, the franchise agreement authorizes Esso to assign the lease, so long as Total offers nondiscriminatory franchise contract terms. In this case, that was part of the agreement, although Esso took no steps to make sure that Total offered a nondiscriminatory franchise. Referring to Exhibit 4, a sublease contract, and Exhibit 5, a supply contract, both made with Fernando L. Martínez–Feliciano, whom Mr. Trujillo did not know, he then noted that Mr. Martínez–Feliciano was a franchisee who owned the property. Comparing Exhibits 4 and 5, with Exhibits G1 and G2, Mr. Trujillo noted their similarity. He noted that Exhibits G1 and G2 was offered to Mr. Martínez–Feliciano who has a lease with Esso. Clause 9.4 of Exhibit 4 relates the consequences of non-compliance which notes the failure of a material obligation of the contract would result in termination of this agreement.

When Esso considered leaving the Puerto Rico market in 2006 and in 2007, it identified Total as a potential buyer. A written offer was negotiated at the end of 2007, and beginning of 2008. The matter was discussed at the Board of Directors in late 2007, and early 2008, although he did know exactly when.

Under the PMPA, Mr. Trujillo describes how the notice was sent by certified mail, and also that Esso delivered the notices by hand. Before March 7, 2008, there were business discussions and negotiations-typical negotiations.[8]

---

7. The banner reading "Soon, Station Operated and Supplied by Total" was displayed in court and translated.

8. Plaintiffs asked me to take judicial notice of the answer to the complaint in Civil 08–2025, Docket No. 10, paragraph 1, regarding plaintiffs' status as trial franchisees, and being engaged in retail sales under a trial franchise

Pierre Vigil testified that he works for Total in Singapore, and had previously worked for Total in Puerto Rico from October 2004 to August 2008 as Total's marketing director here. He holds a B.B.A. with a concentration in marketing. His duties as marketing director were to supervise the retail network and commercial activities of Esso, assure compliance with contractual obligations between Total and its clients, renew their expired contracts, and supervise convenience stores activities. While in Puerto Rico, Mr. Vigil reported to the general manager of the company, Philippe Corsaletti, for those four years, up to April 2008, and then to Rodrigo de Sebastian.

Total entered the Puerto Rico market in October 2004, having purchased Gasolinas Puerto Rico ("GPR") and making a significant investment of about $45,000,000 the last three years. GPR owned the assets of the 100 gas station network. GPR had owned some of the service station properties. Others that were not owned by GPR were rented by GPR.

Referring to Exhibits G1 and G2, Mr. Vigil noted that they were standard franchise contracts, and that these are the current versions, that is, the latest revisions of the franchise contracts. The last revision was made from October 2007 to May 2008. Exhibits G1 and G2 were originally drafted at the beginning of 2005. GPR had contracts that did not comply with Total requirements so Total had to review and revise the contracts so that they complied with company policy. Those contracts were offered uniformly to

the retailers and to woo potential dealers. There were other contracts in effect with other terms. When Total implemented the new franchise contract, it assumed the terms and conditions of the contracts which had not yet expired.

After the 2005 draft, the first revision was in February 2007. This revision was made due to market conditions. A clause was included that gave Total the possibility of subleasing the property to a third party. The last revision was in 2008. Between October 2007 and May 2008, revisions to the franchise agreement were made based on market conditions and also based upon the experience of the three to four years of contractual relationships with their clients. A clause was added to the franchise agreement relating to goodwill. An additional clause was included in the Total franchise agreement requiring a form of personal guarantee, which could be a security bond or a payment bond. This was necessary because Total confronted difficulties in the collection of monies, and because Total was obligated to collect such monies owed from their clients. It thus required a guarantee to limit the risk, which also would reduce bad debt.

In 2007, there was included in the franchise agreement the right to sublease to third parties, that is, to fast food restaurants, the main business objective being to increase client flow at the station as a way to increase sale of gasoline and offer a broader base service to the client. A goodwill clause was included to protect the Total investment in the stations and also to

as the terms are defined in the PMPA; that paragraph 1 is admitted in the answer. (Docket No. 47.) Also that the counterclaim states in paragraphs 6 and 7 that plaintiffs are each franchisee retailers (Docket No. 47, at 6) as defined in the PMPA and that the parties have had an existing relationship. A similar request was made as to Civil 08–1950. Esso's answer states that the allegations are admit-

ted, that Esso has a franchise with plaintiffs as Esso franchisees and in counterclaims 6 and 7, in that counterclaimant defendants are each an Esso franchisee/retailer under the later provisions of the PMPA, 15 U.S.C. § 2801(4), until September 30, 2008. (Docket No. 22.) Esso filed amended answers to correct what they considered an inaccurate pleading. (Docket Nos. 58, 59, 60 & 61.)

protect the brands that Total had in the different gas stations, and to protect the possibility of the leasee's ceding the brand and its goodwill. If there was a change in the retailer, the retailer ceded the marks and the location where the gas station was located. The goodwill clause will protect Total's investments and improvements in the stations. In case the station operator sold the "key" to the business, Total would receive part of the increase in the value of the goodwill in response to the company's participation in the station's increase in value. The retailer has the right to operate and invests working capital. The retailer's investment is guaranteed 100%. The goodwill only applies to the difference between Total's amount of investment and the retailer's investment. For example, if the retailer pays $100,000 for the right to operate the station and sells the operation for $150,000, the initial $100,000 is guaranteed. The remaining $50,000 is distributed between the retailer and company, with 60% going to Total and 40% going to the retailer. This is adequate because of Totals' investment in the location, equipment and the trademark. Goodwill is composed of the real estate location and buildings, investment for equipment and the trademark. Total can be the owner of the property, or Total can lease the station to a property owner. In either event, the equipment is owned by the Total company. Total is the owner of the trademark and makes an investment on the local level and at an international level, through loyalty programs and media.

Mr. Vigil was involved in the modifications of the 2007 and 2008 model contracts. See Ex. H, standard franchise contract for a convenience store. Exhibit H is the last revision made in 2008. It was drafted in 2005, and revised in early 2007. Total has nine "Bonjour" convenience stores and 33 "La Boutique" convenience stores, all located at the gas stations. All of the Total's stores around the world are located at gas stations and are completely integrated in the gas stations, that is, they are cross referenced and integrated so if one is terminated, the other contracts are also terminated. Referring to Exhibits G1 and G2, executed on June 24, 2008, he noted that these are the Total standard contracts, revised between October 2007 and May 2008, and offered to other Total retailers after that date. These are the only ones offered after that date.

Mr. Vigil made reference to the Esso retailer located at Juan Domingo. The retailer is a corporation, and has been a retailer for two months. The same contract was offered to them and was offered for the first time at the beginning of June 2008. (He noted that attorney Carlos E. Montáñez, who represents the gasoline retailers association, represented that dealer.)

Esso advised that it was going to withdraw from the market as of March 17, 2008, with termination date September 30, 2008. Total's offers were made at the end of June to mid July 2008.

In the majority of the cases, contracts were given out inviting the retailer to the company and the Esso dealers were given a draft of the contracts. Then there would be a second meeting to discuss the contract and answer any questions the prospective dealer might have. Other contracts were mailed by certified mail return receipt and later the retailer would be called to make an appointment to discuss the contract and answer questions he may have. Some dealers signed and executed the same. The Esso retailers were offered the Total standard franchise contracts. See Ex. F1 and Ex. F2. These are standard franchise contracts offered to an Esso retail, in this case to Mr. Héctor Gierbolini. They are essentially identical to the Esso contract but different in the description of the station and name of

retailer. See Ex. "I" and Ex. "J". Exhibit "I" is the sales and supply contract. Exhibit "J" is the lease agreement. The standard franchise contract signed by an Esso retailer, compared to a Total standard contract, is essentially identical.

In Puerto Rico, Total Petroleum has about 5% of the market share, and the object of the Esso transaction was to reach 15% of market share or more. Total now has 80 service stations without Esso stations, and the projection is to have 240 Total stations. The transaction also includes fleet cards, aviation, and industrial clients. Clients would include government agencies, municipalities, private companies, and aviation companies. Total was supposed to be servicing them by the announced date of October 1, 2008.

Prepaid cards were to be operating by October 1. The Esso prepaid cards could be used at the Total stations. Total made recruitment efforts. Sixty Esso employees were recruited. Total needs their expertise because of the dimension of the operation. These employees are completely necessary to operate the new company.

Total had to find new offices and moved to offices close to Esso offices in order to incorporate the employees. Total had to make the necessary steps to be ready at the industrial level and the retail level. It made arrangements to lease the Cataño terminal and the Corco terminal on the southern end of the island, as well as the Capeco terminal for the aviation operation. Total's image suffers because it said it would take Esso's assets by October 1, 2008. There exists the possibility of losing clients. Employees are in an uncertainty.[9]

Total (France) purchased GPRs assets and GPR became Total. The relationship between Total (France) and Total Puerto Rico is that the latter is an affiliate of the former. Mr. Vigil did not know the identity of the shareholders of Total Puerto Rico. Total assumed the franchises of GPR. None of the franchises were terminated but rather assumed, and the franchise contract revisions were made to the contracts that Total assumed. The GPR agreements did not include a clause to sublease the contract. See Ex. F2. Mr. Corsaletti signed the franchise contracts. See Ex. 7. Exhibit 7 is a Total lease contract, dated May 15, 2006, for a term of three years, ending on May 14, 2009. The contract represents an existing franchise between Total and a franchisee.

At page 3 of Exhibit F2 (lease agreement), article 3.2, there is a reference to exclusions which states that the retailer admits that the company has the right to rent parts or areas where the station is located, including inside the structure, to third parties for any use. The rent stated for this agreement will not be affected by that previously expressed and no discounts or credits for this particular thing will be given. This sublease clause is the one being offered by Total to Esso retailers. In Exhibit 7 (lease agreement), there is an exclusion clause, pages 4–5, clause 6.5, reading in part "rent to a third party, canon for rental between franchisor and franchisee not be affected." Thus, while they are similar, there is a difference in the manner of drafting. The sublease clause was included in May 2006. Referring to Exhibit F2, article 9.4, Mr. Vigil noted that the goodwill clause was inserted in the contract offered to Mr. Gierbolini, while a comparison of Exhibit 7 and Exhibit F2 shows that Exhibit 7 does not contain the same goodwill clause as in F2. Also, referring to Exhibit F2, page 24,

9. While testimony was heard regarding hardship to Total, Total's hardship as a prospective or successor franchisor is candidly not a direct factor to be considered under the PMPA. *See Avramidis v. Atlantic Richfield Co.,* 623 F.Supp. 64, 67 n. 6 (D.Mass.1985) (citing 15 U.S.C. § 2805(b)(2)(B)).

article 20.11, relating to fleet cards, he must accept those fleet cards in his service station. When compared to the existing franchise, Exhibit F2, article 20.11, and Exhibit 7, such a condition is not there. Referring to Exhibit 4, a sublease contract being offered to Esso retailers, Mr. Vigil explained the reason for a sublease. Mr. Vigil noted that clauses related to goodwill, sublease and fleet cards are offered to franchisees who are owners of the real property. These owners are offered a standard sublease. In Exhibit C, lease to owner of real property, the clause does not appear. As to Exhibit 4, page 11, article 10.4, regarding goodwill and right of first refusal, the clause is in Exhibit F2, Mr. Gierbolini's contract, but is not in Exhibit 7, and the fleet card clause is not found in the 2006 revision.

Mr. Vigil affirmed that there are no differences between the Esso franchisee offers and the existing franchises. The first Total franchise revision was not performed in 2005, but rather the contracts were standardized at the beginning of that year, in accordance with company policy. Total worked on the Puerto Rico company and changed the contracts according to the needs of the market's requirements and the policy of the company. In Puerto Rico, there were new concepts like the Bonjour Stores which were not in the GPR company, so Total had to draft new contracts.

Mr. Vigil talked about a first revision of the franchise contract in the beginning of 2007. One would have to compare a 2005 to a 2007 contract to see what were the differences. The first sublease clause was included before the revision of 2007. Revisions are not done so superficially, and are made during the life of the contract. The sublease was included in the evolution of the contracts and was not a superficial clause. The next revision was made in 2008, and worked on from October 2007 to May 2008. Mr. Vigil did not intervene in the negotiation between Esso and Total, although he worked on some elements, such as the analysis of the station network, and concepts of the convenience stores. While doing that analysis, Esso had commenced serious negotiations with Total. The insertion of the goodwill clause is due to the fact that it is in the standard Total contract at a world-wide level. It was not included in the first 2005 revision which reflected that goodwill pertained to the retailers, which is not true. Thus Total reviewed the contracts at the end of 2007, and understood that Total had the right to part of the goodwill.

When the retailer sells the goodwill, he has to share that goodwill, which has three elements: location, Total investments, and the Total brand.

The goodwill clause applies to the difference in two prices and applies strictly as previously explained. For example, the retailer determines the purchase price with another retailer and that total is considered as the price to apply in the goodwill clause. The time the retailer has operated the service station is not considered by Total, so that if Mr. Gierbolini purchased a goodwill for $175,000 and the station was selling 15,000 gallons a month, and today, it sells 150,000 gallons a month, and the station sold for $500,000, the years of operation are not taken into account. The company has a right to its part of the goodwill. Goodwill is stipulated in the contract so that if he were to sell the station today, and had brought the station from 15,000 to 150,000 gallons a month, the 60–40 formula would still be the formula. The goodwill clause is there to protect the trademark. The retailer cannot sell the franchise without Total's approval in order to protect the trademark.

Mr. Bonini participated in the version changes as to the engineering parts, Mr.

Moragues in the part of insurance, and Mrs. Xiomara Pichardo as to the convenience stores. When they prepared the revision, they established a minimum rent. Mr. Vigel is aware that DACO (Department of Consumers Affairs) Regulation 2758 establishes a ceiling on the amount of rent that can be charged to a retailer of a service station. Department of Justice Regulation No. 1 prohibits any attempt by the oil company from inhibiting the efforts of a retailer from increasing the goodwill of the service station. Exhibit F2, page 2, article 4.4 states that Total reserves the right to increase the rent to take into account investments made by the company. In Puerto Rico, oil companies cannot operate gasoline service stations.

There are different franchises depending on the activity. There are franchisees that have more than a lease and supply agreement, such as a boutique, or a car wash. To those that do not have a store, no offer of a store is made. La Boutique and Bonjour must comply with certain criteria, such as size and location. Certain franchisees were offered the La Boutique franchise.

In relation to the retailer at the Juan Domingo site on Road No. 2 in Guaynabo, the prior retailer had passed away, so Mr. Vigil notified the widow that the franchise was being terminated. She is a shareholder of the corporation that signed the agreement but not the retailer.

Mr. Vigil stated that it was Total's policy to treat its clients fairly and that the contracts were offered in the ordinary course of business. When Total sent the offers of contracts, the retailers were contacted to meet them and for Total to give them the contracts, to set up a date, some days or some weeks later. Total designated people provide the contracts and answer questions, and if a question could not be answered, Total's lawyer could answer the questions. The designated people were Fernando Bermúdez, Michelle Bengoa and Víctor Durán. Nicolás Moragues, the financial director of Total for two years, normally would not have knowledge of the franchisee.

The Total employees in Puerto Rico participating in the Esso offer were the general manager at that time and the financial director, Mr. Philippe Corsaletti and Mr. Moragues. While Mr. Vigel noted that due diligence was conducted with Esso in relation to the purchase of assets, he did not know what said due diligence consisted of, and that Mr. Corsaletti would know. Such due diligence began before Esso accepted the offer from Total. Mr. Vigil did not know who at Total made the offer for the assets. Total France was the one that made the offer to purchase Esso. Total Puerto Rico does not know how the offer was conveyed or in what fashion or when the offer was made.

Due diligence is over and Mr. Vigil did not know when it finished. He did not know when Esso decided to leave. After the offer was accepted for the purchase of the Esso assets at some point, he was tasked with offering a standard contract similar to what Total had with its retailers. He was also tasked to interview and engage the necessary employees, and work with Esso employees in the transition. Total and Esso do not share the same space. Total has purchased land but Total France would have the information of who purchased the land. An environmental assessment is made, although he did not know if Total finished making the environmental assessment of those properties. He never saw the contracts for sale of assets.

In relation to the "take it or leave it" phrase, he said that the contract is on a "take it or leave it" basis. It means you either accept it or you have to leave. While Total did not have the attitude of

take it or leave it, not all clauses are negotiable. Mr. Vigil testified that the following terms are not negotiable: Exhibit F2, clauses 3.2, 4.2, 4.3, 4.4, 4.5, 4.7, 5.1, 5.2, 5.3, 5.4, 5.5, 6.1, 6.2, 6.3, 6.4, 6.5, 7.1, 7.2, 7.3, 8.1, 8.2, 8.3, 8.4, 9.1, 9.2, 9.3, 9.4, 9.5, 10.1, 10.2, 10.3, 10.4, 10.5, 10.7, 11.1, 11.2, 11.4, 11.5, 12.1, 12.2, 13.1, 14.1, 15.1, 16.1, 16.2, 16.3, 17.1, 17.2, 18.1, 19.1, 20.1, 20.2, 20.3, 20.4, 20.5, 20.7, 20.8, 20.9, 20.10, 20.11, 20.12. These are unnegotiable: "take it or leave it."

He stated that clause 4.1, at page 3, and appendix A, were not negotiable. This involved the right to sublease parts, in article 4.1, and no adjustment on the lease if Total decides to sublease. The rent can be lowered or raised but normally the rent is lowered. Mr. Vigil noted that Total can increase the rent if there is a justification. Clause 4.2 reserves at Total's absolute discretion the right to raise the rent, with previous notification of the rent to be paid, and other charges payable to the company, and the right to solicit payment by certified checks. This can be negotiated.

Article 9.1 reads: "The retailer ... if it is a corporation, agrees to operate the station full-time, noncompliance of this contract will affect patronage of other service stations, constituting a material breach of this contract and cause of termination."

Referring to the contract offered to the Suvial corporation, lease agreement, station 114897 (Ex. 12), and supply contract (Ex. 13), article 8.1 and Exhibit 14, these were sent to Suvial, an Esso franchisee.[10] Article 9.1 of both exhibits in the penultimate sentence, notes that the retailer will be responsible for the obligation to personally operate the station, and if he does not, it gives Total the right of termination of the contract. In other words, if the leasee

is a corporation, it must personally be at the station full-time. The corporation recognizes that not complying will affect other service stations, and thus constitutes a noncompliance with this contract and cause of termination. This is the same as Exhibit F2 and Exhibit 4, article 10.1. Both require full-time service at the same time. If the company signs both contracts, it would be in breach of article 9.1.

The offers are essentially the same for all of Esso's franchisees. Referring to Exhibit 15 (sublease 114687) and Exhibit 16 (sublease agreement) with Esso, the franchisee in Exhibit 16 is the conjugal partnership composed by Julio C. López–Rodríguez and Carmen H. Mercado–Reyes, subleasee or retailer. Making reference to Exhibit 18, and comparing it to Exhibit 15, Mr. Vigil noted that Julio C. López–Rodríguez was offered the franchise.

Referring to Exhibit 18 (lease agreement), under the franchise agreement with Esso, the franchisee was described as the society composed of Sixto Pabón–García, Santos Pabón–García, and José Antonio Pabón–García, residents of Guayama and Patillas. Only Santos Pabón–García received the offer.

After Mr. Trujillo and Mr. Vigil testified, and after the offer of proof was made, plaintiffs filed in open court a motion under Federal Rule of Civil Procedure 52(c), which was denied. Plaintiff argued at sidebar that the proffered Total franchise contracts are illegal and that the only remaining matter would be the amount of punitive damages to be fixed by the court and paid to plaintiffs.[11]

Jorge Torres–Caratini testified that he is the president of TC Oil Corp. On April 12, 2007, he received a hand delivered letter regarding an Esso-owned franchise

---

10. Exhibits 12 & 14 are the same.

11. As a result of a partial stipulation, Exhibits 19, 20, 21, and 22 were admitted.

store, On–The–Run. See Ex. 24. On–The–Run is a convenience store which sells items of first necessity. Esso owns the trademark and TC Oil operates it under a contract, effective May 1, 2007. He has had the franchise since May 2004. See Ex. 24, at 36, article 12.2.4. This refers to the "uniform franchise offering circular" which was not given to him on that date, but was given to him initially in 2004. It provides information in relation to the franchise and its relation with the company, and stipulates how the franchise works. Exhibit 25 is a uniform franchise offering circular given to him in 2004 and is similar to the one given to him in 2007. It gave him complete information and assurance of security, and had information required by the Federal Trade Commission ("FTC"). Referring to page 2 of Exhibit 26, Bonjour franchise contract, station 115047, Mr. Torres–Caaratini received this at the office of Total where he was interviewed by Mr. Bermúdez. He also got two other documents, one regarding the Bonjour franchise contract. The franchisee would be TC Oil Corp. Mr. Bermúdez did not give Mr. Torres–Caratini a copy of the offering circular required by FTC. He received a lease agreement, Exhibit 27, on May 11, 2007. The franchisee is TC Oil Corp.

Mr. Torres–Caratini has a B.B.A., and is a CPA, and certified fraud examiner as well as a certified shopping center manager. He has also been an assistant secretary for enforcement for DACO. He noted that Esso determines the rent using DACO guidelines. This gave him assurance that the rent would be regulated and evaluated for the gasoline stations. In Esso contract 115047, Esso would lease the totality of the gas station. TC Oil

Corp. is the franchisee. In the Total contract, DACO is not relied upon as a rent guideline. On the contrary, the right to set the rent is reserved to Total, at any point in time, and even the space leased, which has repercussions on the rent. As a certified shopping center manager, he has seen hundreds of these agreements, but nothing like this one.

TC Oil Corp. has 10 employees. The corporation acquired the ongoing business operation or "key" [12] to an Esso gas station by incurring in debt with a bank. If the Esso contract is terminated, it would be disastrous. Even if forced to sign this contract, he would not sign it. There are so many things imposed by Total, that it would be like Total is running the gas stations.

After receiving the notice of March 17, 2008, notice of termination based upon market withdrawal, he received a follow-up letter. That letter from Total welcomed him to the Total family, and he was invited to meet and discuss the new agreement, to continue to sell gasoline in the same location. He was offered an agreement to run the convenience store. Mr. Torres–Caratini was not happy with the contract provisions of Total, such as rent. He had concerns with the ability to increase rent by Total. There was no dispute as to current rent. Total has no cap for rent, while DACO gives him assurance. Making reference to a severability clause, (see Exhibit 28, at 23, article 20.10), he noted the intention of the parties is that the contract be complied with in its entirety according to the law.

Mr. Torres–Caratini looked at Exhibits 26 and 27, clause 3.1.2 regarding the right

---

**12.** The word "key" as used by the plaintiffs in these testimonies refers to the translation of the colloquial phrase "la llave del negocio" as used by Spanish speaking Puerto Ricans referring to the purchase of an ongoing busi-

ness. Generally, the purchase of the ongoing business includes the acquisition of assets, liabilities and previous contracts and arrangements.

to increase the rent, and accepted such clause, signing the agreement. Clause 3.1.2 notes the rent increase can be made up to 10% because of additional improvement, but Esso is not obligated to carry out improvements.

The monthly rent is established in Exhibit 27, Annex A. From January 1, 2008 to December 31, 2008, the rent is $2,000 a month. From January 1, 2009 to January 1, 2010, the Esso rent is $3,000 a month. Total's offer was $2,000 a month, see Exhibit 28, article 4.1. That rent starts from signature for a period of three years. As of January 2009, Mr. Torres–Caratini would have a better rent deal with Total, although he feels Total contract terms are unreasonable in some of the provisions. He does not object to personal bonds, or payment and performance bonds, but does object to a third-party lease.

Aurea del Carmen Viera–Lourido, of Delmaried Inc., operates a station in the Municipality of Florida, as a franchisee of Esso Standard Oil. She owns the land where the station and building are located. Referring to Exhibit 29, the lease agreement, she noted her signature on the last page, with a lease agreement expiring in November 2008. She received the Total documents and they gave her contracts which did not work because they did not recognize that the lot or building were her property. Mr. Bermúdez of Total was the one with whom she talked. Mr. Bermúdez told her that officials were going to visit the station. She has been operating for some 20 years, and had rented for 10 years, but since 2000, she began to operate it again. Previously, gasoline was delivered to the station with pretty trucks with the Esso emblem showing, including the Esso tiger. The recent delivery trucks are not identified and have tanks that are not

labeled. Customers complain that it is not the same, that the gasoline does not perform the same. In her own car, if she uses regular gasoline, the car gives off a noise, and a strange peculiar odor. The odor is so strong she had to put in an air purifier in the business since she cannot deal with the smell. The invoice says ENERGY, which is the additive that makes the gasoline a brand name gasoline. She thinks it is not the one she usually gets.

She received a letter dated March 17, 2008 announcing the termination. Total did not offer her a franchise contract. Mr. Bermúdez gave her the set of contracts and said he had to give her the documents but told her not to read them. Ms. Viera–Lourido leases the station to Esso and Esso leases it back. The contract expires in November 2008.[13]

Francisco Huertas–Román lives in Utuado and operates an Esso station since May 1, 2007 in Utuado. He signed a one year probationary contract. In March 2008, before his one-year contract expired, he received a communication from Esso informing him they wanted to terminate the contract. He talked to Dinorah García who is in charge of the Esso territory. At the food court in Plaza Hatillo, she gave Mr. Huertas–Román another contract, which he signed in May 2008. Ms. García said it was a three-year contract. Ms. García gave Mr. Huertas–Román no copy of that. She said she would give him a copy of the contract when her bosses signed it. On more than 10 occasions, he tried to get a copy of the contract, the last time being September 17. Esso personnel said that the contract was not there.

Edgar Dávila–Oliveras testified regarding the Mece Investment Corporation. He is the son of Edgar A. Dávila–Carmona,

---

**13.** Generally, franchisors are entitled to terminate a franchise relationship when the underlying lease expires. *See Amadeo v. Mobil Oil Caribe, Inc.,* 642 F.Supp. 962, 964 (D.P.R. 1986).

the president. They previously had an Esso station at San Patricio Plaza for 35 years, and in January 2007, the Esso station was returned to Esso. Eileen Díaz, Esso manager of the Carolina area, and the Esso representative talked to them about a station in Canovanillas. The condition of the station was depressing. It was a dump yard. There were tires around, car motors, and other things. There was a mobile cafeteria within the lot, also in depressing conditions, and operated by María Milagros González–Santos. He had to pay for the "key" to get into that station. See Ex. 30 (sales contract). His father's signature is there, Edgar A. Dávila–Carmona. José Monroig–Zayas sold him the "key". When the San Patricio station was closed, Esso told them to talk to Mr. Monroig–Zayas to make him an offer for the "key". They did. Mr. Monroig–Zayas had legal proceedings going on with Esso.[14] Esso offered Mr. Monroig–Zayas a deal and he accepted. Mece entered into a lease agreement with Esso. In the receipt, the dealer on page 2 is identified as Mece Investment Corp. The date of the franchise agreement is August 1, 2007. See Ex. 31 (sales contract). Esso never told the cafeteria owner that she had to leave, so they approached the owner of the cafeteria at the suggestion of Eileen Díaz. Mr. Dávila told the owner that the cafeteria has no rent contract, no use permit, no health department approval, no fire department approval, and that she was there illegally since 1993 or 1995. Ms. González–Santos told him to give her $55,000 for the cafeteria. She said she had bought the "key" from the person before, José Manuel González–Pagán, in 2006, and he had been there for all that time since 1992. In 2006, the station was closed. She was offered $30,000 and given two weeks to accept it.

Then she said she needed money so the offer was reduced to $15,000. She accepted the offer and left. See Ex. 32. Later, the municipality informed him that new regulations were coming in. He was unaware of this. He had to make handicapped bathrooms. Esso said it was not paying for the bathrooms because Esso is leaving at some point. The rack (pinos) area for oil changes had a zinc roof and it got wetter inside than outside so the corporation improved the area for when it rained. Esso would not help with that either. Mr. Dávila–Oliveras spent more than $200,000, including the "key" and improvements. Esso and Mece signed an agreement in May 2007, so that it would go in effect in August 2007. See Ex. 33. Esso expected that in those three months the station would be operational. In August 2007, it was not ready to operate because of the improvements that Esso was going to make and did not comply with. He gave Esso a list of all of the things that he had told Esso about, in this case to Engineer Héctor Sánchez, and of the minimum improvement that he should help with, since Mr. Dávila–Oliveras had fixed the bathroom. See Ex. 34. Esso did begin to fix things at the station during the last week of September 2008. They said they would do it because they were leaving soon and wanted to leave the station as agreed.

Mece has a contract with Esso, signed by Mr. Dávila–Oliveras' father. He received a letter from Total offering a contract and that would allow the corporation to operate the station that it had with Esso.

Diego Carrasquillo–Rodríguez, operates a gas station on Road 185, in Canóvanas. Michelle Bengoa gave him the Total con-

---

14. *See Esso Standard Oil Co. v. Monroig–Zayas,* 352 F.Supp.2d 165 (D.P.R.2005), *aff'd,* 445 F.3d 13 (1st Cir.2006).

tract. Mr. Carrasquillo has a B.B.A. in Business Administration and worked for 40 years in the electronics industry. He met with Ms. Bengoa afterward, and showed her some things from the three contracts, pointing out a series of things that he did not agree with in the contract. She answered that that was the contract, that it was a new hat that he had to put on. She said once signed they could negotiate. He told her it was not acceptable. Signage had deteriorated a little bit, as did the quality of the gasoline. There were complaints from customers that they have found water in their gas tanks. They have brought him receipts of the companies where they have taken their cars to fix, such as Lexus and Mercedes Benz. He made a request through the Esso Brazil network for maintenance and said he had water in the premium gasoline tanks. They sent someone to clean up the tanks. They took two inches of water out of the tanks. He had never had water in the tanks. Even the day before he testified an inch and 40 centimeters of water was taken from the tanks. He received a letter on March 17, 2008, announcing termination, Total made an offer to him so that he could run the station.

César Cortés–Mercado, testified that his father and mother entered into a sublease agreement on May 23, 2001. See Ex. 35. The franchise agreement has his father and mother's signature. Esso franchisees is described as the conjugal partnership of Julio C. López–Rodríguez and Carmen H. Mercado–Reyes. Total only offered Julio C. López–Rodríguez a franchise. Mr. Cortés–Mercado said that the notification was renewed on March 17, 2008, although he was not sure of that date. Total sent a letter offering to continue the selling of gas at that location.

Francisco Javier Hernández–Serrano, is vice president of Godher Corp. which has a franchise with Esso. He had three meet-ings with Mr. Bermúdez from Total. In the first meeting, Mr. Bermúdez handed over contracts. There were some clerical errors. He left the door open to set up another meeting. Mr. Hernández–Serrano has a partner, Mr. Carlos Godines. They talked about the agreement at Total. When told Mr. Hernández–Serrano wanted to express himself about the contract and the condition of the station, Mr. Bermúdez said they would not be able to sell either fleet cards or government services if the contract was not signed before October 1. Mr. Bermúdez said he knew about this case, and if the case got better terms in the negotiation, the contracts would be amended. And if the group got a better deal from the court, they could amend the contract. Mr. Hernández–Serrano found the 60–40 goodwill provision unfair since Total had not put anything into the station. They would have to divide the amount among themselves and then 60–40 with Total. They suggested it could be the other way. But Mr. Bermúdez said they would get what the group got in this case. He paid $400,000 for the "key" and has not made improvements.

Mr. Hernández–Serrano is a shareholder of Godher Inc. He received the letter of March 17, 2008 announcing termination, and then a letter from Total offering a contract to permit Godher Inc. to sell gasoline at the current station.

The Total rent offer was $1,700 as of October 1, 2008. With Esso from October 1, 2008 to October 1, 2009, the rent would be $2,000 and from October 1, 2009 to October 1, 2010, the Esso rent would be $3,000. Mr. Hernández–Serrano has received offers to sell the station. He would receive the full price. If he signs the Total contract, he would receive 40% of the capital.

José A. Pabón–García testified and referred to Exhibit 38 and to Exhibit 39

(supply contract and attachment). The Esso franchisees are Sixto Pabón–García, Santos Pabón–García, and José A. Pabón–García from Guayama and Patillas. See Ex. 39, at 1. Exhibit 40 is a letter addressed to Sixto, his brother. Total identifies Santos Pabón–García as franchisee. One is a sales and supply contract.

Mr. Pabón–García runs the dealership with his brothers, and they work closely as administrators. They have had a franchise agreement with Esso for a number of years and own the land. Total offered to let them run the same franchise on the same premises. He was not notified, but his brother was notified. Some time later his brother let him know. The brother did not immediately tell him of the notification. The offer to the brother was to run the franchise in the same place.

Jesús Rodríguez–Quiñones, has operated an Esso service station, with his wife, Wanda Vélez–Torres, for 25 years. (See Ex. 41, pictures of the station when it was opened.) Esso has taken the signs down. Clients are concerned. Consumers question if it is still Esso and they ask about his lack of fidelity to Esso on a daily basis. The 25 years of faithful service and trust has gone down the drain. There is an impact on the employees on a daily basis. The public asks questions about the gasoline and signs that do not exist and the employees do not know how to explain. The gasoline is delivered by truck with no identification. The smell is very strong. He himself has been affected by the smell. He cannot smell strong contaminants. He has never sensed a strong odor like that from gas in 25 years.

He was notified on March 17, 2008, of Esso's withdrawal from the market. Then there was a follow-up from Total. He was offered a contract that enabled him to continue to operate at the same location with the same dealership. The large Esso oval sign is still there and Esso continues to deliver gasoline. Total offered a rent of $2,800 a month. Esso's existing contract is $2,820 a month now, to increase on March 31, 2009, to $3,000 a month rent. See Ex. L, Annex A.

Ivette Colón is an operator of an Esso gasoline station on Jesús T. Piñero Avenue. Esso signs have been removed from the exterior and interior of the Tiger market store, although the large oval Esso sign remains. She has asked the trucker who delivers the gasoline what kind of gasoline is being delivered since there is no identification on the truck. He did not know. She, her family and others are all complaining of the strong odor that remains in the cars. She and her family get gasoline there and all are complaining.

She has had the franchise for many years. Her husband was a franchisee, and when he died, she continued with the franchise. She received a letter dated March 17, 2008 informing of the termination effective September 30. Total followed up in order for her to continue running the gasoline station as a franchisee. She did not understand the clauses in the offer, which included her ability to sell gasoline at the same location.

Ms. Colón said she paid Esso $500 as a service fee, and the rest is $1,000 rent for the station. Esso owns the land.

Plaintiff Héctor Gierbolini testified having been a retailer since 1986, and preferred being an Esso retailer because of the goodwill guaranteed. His station is located at Road 1, Km. 30.8 in Caguas. He paid $100,000 for the "key" to the business ("la llave") in 1986.[15] The station remains in the same condition. It provides split service, full and self, and has a "criollo" [16] mini-market as well as a mechanic.

---

15. See footnote 12.

16. Native, meaning selling local products.

In 1986, the station sold 15,000 to 20,000 gallons a month. Today he sells 90,000 gallons a month. Referring to Exhibit C, he received a similar termination notice to it around the same time of the date reflected. He was notified by telephone to meet with Michelle Bengoa a month to one and a half months from the date of the letter. He had the meeting, the purpose of which was to give him the Total franchise contract. There were clauses in the contract from Total that were controversial, such as the 60–40 clause, which had to be discussed. She said Total was the owner of the goodwill so he said he was not going to sign it. He received a copy of the contract. Referring to Exhibits F1 and F2, he said Ms. Bengoa asked him to please read the contract, and said he could not buy the land and station, although he is interested in buying the land. The 60–40 clause, at page 11, article 9.4, of the lease agreement was unacceptable, and he told her no other retailer would accept it. If he were to sell the business, the 60–40 was not explained. If a fast food was put there, he was not to be concerned. Mr. Gierbolini questioned the benefits if he accepts this kind of business, including the increase in insurance policy and the security to make sure that he paid the bills to Total. If he had to operate under such conditions, he would close the business.

Carlos Martínez–Feliciano operates an Esso service station on José Quintón Street in Coamo, and has been an operator since January 1992. He owns the land. He has a rental and a sub-rental contract; that is he rents the property to Esso and Esso subleases the property to him. Exhibit 42 is the lease agreement to operate the station, signed in 1998 and good until 2010. Thus it is still in effect. At page 11, clause 11, it says that the company can sublet part or all of the property and will not need permission of the franchisee if it is to an affiliate of the company. It will notify the franchisee. Esso never communicated the cession of the lease agreement. They sent some letters but he commented that he did not agree. He paid $50 a month in the sublease. The lease is $1,500 and Esso deducted $50 a month. Esso sent a letter informing they were going to terminate operations. See Ex. 43. Mr. Martínez–Feliciano was contacted by a Total representative. Referring to Exhibits 4 and 5, he stated that they are copies of the supply and lease contracts given to him. Article 3.2 of Exhibit 4, lease agreement, states that the company has the right to rent part of the property to a third party and there will be no credit in the rent from the franchisee because of this detail, that is, that the rent will not be affected in any way. He does not agree with this since the property is his, not Total's. Looking at Article 5.1, page 3, he noted that the rent was $150 a month for the sub-rental, the minimum rent under Total. Under the Esso sublease, the rent is $50 a month. Esso had told him that an amount had to be established so that the sublease was legal.

Referring to Exhibit 4, article 10.4(d), page 11, titled Plusvalía (goodwill), he noted that the 60% of the difference between the price of the proposed cession of right to operate, and the amount the retailer paid when he acquired the right to operate, must be justified. Furthermore, the consent of the company is necessary. The sale must be made in good faith, and in the ordinary course of business. Mr. Martínez–Feliciano does not agree with this clause since he is the only one that invested in the station.

In the PMPA franchise agreement and the rental agreement, the lease can be assigned by Esso with his consent. He received a letter on March 17, 2008 terminating the PMPA contract. He did not recall receiving a letter dated April 16, 2008, which sought his consent to assign

the lease agreement Esso has with him. He did not remember agreeing to that assignment on May 8, 2008, but did remember that the zone representative, Eileen Díaz, called him to a restaurant near the town and gave him a short letter that he did not want to sign, although she insisted. In the letter he agreed to assign the underlying lease. The letter stated that if he did not agree to the assignment, the contract would no longer be in effect and he could enter into an agreement with anyone else he wished to. If he did not accept Total's contract, he could contract with anyone else. Mr. Martínez–Feliciano agreed to the Esso lease to Total. See Ex. "O".

Plaintiff Jorge Luis Lebrón–Otero once administered his father's gas station. On May 29, 1989, he bought a station at Road 113, Guayabo Ward in Isabela and became a bonafide dealer. He is a member of the Centro Unidos de Detallistas de Gasolinas (United Center of Gasoline Retailers) and president of the Gasoline Retailers Association. At the time of purchase, he bought the "key" ("la llave") for a traditional service station with carwash, auto-part, tire center, and lubrication center. In 1989, he sold Esso gasoline. He operated the station and Esso owned it. In 1997, he acquired the station after negotiations. Esso offered to sell it to him. In the cession, he agreed to sell their brand for 20 years, and Esso would pay him $1,800 a month, or three cents a gallon of gas and diesel sold, whichever was higher. There was an investment in the property shared between Esso and himself.

Exhibit 44, lease agreement with Esso, clause 3, page 4, states that the subleasee to leasee monthly amount for the lease would be $1. Esso entered into a sublease with Mr. Lebrón–Otero. See Ex. 45. The term of the sublease is 20 years, and the lease agreement as owner of the real property is 20 years. At clause 3, page 2, the rent on sublease he will pay Esso is $1 a month for 240 months. The circular letter to all retailers said Esso was leaving and Total would be visiting them to present a transition agreement. Total contacted Mr. Lebrón–Otero. He then received a call from Ms. Bengoa, and one of the Total executives, and tried to get date for a meeting. In a nutshell, he did not call for a meeting and they never met. He has not met with a Total executive. Mr. Lebrón–Otero wrote a letter to Estuardo Trujillo, with copy to Mr. Corsaletti, and explained he was not in agreement with ceding the contract and told them he was worried because some of the terms of the 1997 agreement had not been complied with by Esso, and aside from the agreements, he was not getting the maintenance service that he had been getting over the years, causing him problems in the operation. Total sent him the contract for lease and sublease contract through certified mail. See Ex. 46. At page 3, clause 5.1, the rent that appears is $150 a month while he now pays $1. Comparing this with Exhibit 44, page 4, clause 3, it reflects $149 a month in favor of Total. In Exhibit 46, page 3, article 3.2, it notes exclusions, and that parts of the station can be rented to third parties, and that the rent will not be effected, and retailer would not get credit for this particular. Mr. Lebrón–Otero does not agree with this clause because it is not in any other Esso clause he signed in 1997, and he would be ceding the use of his property. This would be a reason not to sign the contract. Looking at page 11, clause 10.4(d), the goodwill (plusvalía) is 60% of the difference between what he paid, and what it is sold for, in good faith and in the ordinary course of business. These terms were not in the Esso contracts he signed in 1997. Mr. Lebrón–Otero examined the contracts that Total sent him and felt that signing would signify a bankruptcy of his operation.

Mr. Lebrón–Otero received two agreements, the franchise and a lease agreement, and received the notice letter of termination of March 17, 2008. He received an offer from Total to continue to operate on April 16, 2008. He also received notice from Esso about the cession of the lease agreement to Total. See Ex. N. In the lease agreement with Esso, there is no need for him to consent to the assignment of the contract. There is no requirement that it needs or does not need his consent, although the letter to Mr. Trujillo said he did not consent to the assignment.

Plaintiff Brenda Lisa Hernández–Vélez has operated an Esso station and a store on Road 1 in Caguas for two and a half years. The convenience store sells soda, chips, etc. She pays no rent separately for the store, and all is included in the rent. Sales of the store have increased from $4,000 a month to the present of $25,000 a month. Due to competition, the convenience store is one of the most important factors in the business. Esso gave her permission to operate it.

Total sent her contracts through Fernando Bermúdez. Referring to Exhibit 47, it refers to a franchise for the boutique. He said he would be changing the store for Boutique or Bonjour.

Ms. Hernández–Vélez received a notification of termination on March 17, 2008, and was told that Total would be contacting her. If she agreed to a Total contract, she could continue to sell Total gasoline at that location under that contract.

Plaintiff Frankie Vega–Arce operates an Esso Service Station. Referring to Exhibit 49, a supply contract, he noted that Marisol Molina–Méndez y Frankie Vega–Arce, together, are the franchisee. The husband and wife operate a service station and convenience store, and a Church's Fried Chicken. The convenience store provides $60,000 to $70,000 a year income.

They can survive because of the store, because what they earn selling gas is not that much. Víctor Durán gave him two contracts. Mr. Vega–Arce reacted that he did not have this kind of contract, and that there must be an error somewhere. Mr. Durán called his boss, and then said they would make an arrangement with the owner of the property. They were to meet somewhere close to clarify doubts and sign the contracts. Mr. Durán did not send Mr. Vega–Arce a franchise agreement. He mentioned Bonjour and something else but Mr. Durán has not talked to him again.

Mr. Vega–Arce got the termination letter on March 17, 2008, and was given the opportunity to continue as a Total dealer.

After the last witness testified, plaintiffs made an offer of proof that should other plaintiffs testify they would describe the injuries they received as to the debranding of the stations, the uncertainty related to the gasoline, in terms of being branded and unbranded, catastrophic, serious injury, and damage to their reputations.

After all evidence was presented, plaintiffs asked me to take judicial notice of the pleadings in Civil 08–1950, specifically Docket No. 22, Answer to the Complaint, and Docket No. 54, Answer to the Complaint and Counterclaim, and also sought that the answers be admitted under Federal Rule of Civil Procedure 8(b)(6), specifically paragraphs 6 and 7 of the counterclaim signed by Esso. Further, plaintiffs relied on Rule 801(d)(2)(A)-(D) to have paragraphs 6 and 7 of the counterclaim, and paragraphs 6 and 8 of Docket No. 54 admitted against defendants. Plaintiffs also argued under the same rules above, and in relation to Civil 08–2025, *Fonseca v. Esso*, that those admissions be considered against Esso, especially Docket Nos. 55 and 59, paragraph 7 as to the existing franchise, and paragraph 8 of the counterclaim.

I may take judicial notice in pleadings of any of these cases and therefore note what was alleged by Esso in the pleadings. *See Schott Motorcycle Supply Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 61 (1st Cir.1992). Similarly, I will also take judicial notice of the amended answers to the complaints filed by Esso upon their realization that they (Esso) erroneously responded to the complaint assuming all plaintiffs were franchisees when in fact not all plaintiffs are Esso franchisees. Mistakes of fact cannot be relied on to create a contractual relationship based upon an erroneous pleading or even the thrust of a rule of evidence, Rule 801(d)(2)(A)-(D). It is so in this case.

## PETROLEUM MARKETING PRACTICES ACT

In *Avramidis v. Arco Petroleum Prod. Co.*, 798 F.2d 12, 13–14 (1st Cir.1986), the court of appeals describes in a nutshell the scenario presented in the present action. The opinion reads in part as follows:

This case involves the construction of various provisions of the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 2801–2806. The PMPA governs certain aspects of the relationships between gasoline marketers and their franchisees (hereafter referred to as dealers), including the termination of franchises. Under § 2804(b)(2)(A), a franchisor who elects to discontinue marketing gasoline in a given geographical market area must so notify any dealer in that area not less than 180 days before the effective termination date of the franchise. In addition, if the dealer is a lessee, the franchisor withdrawing from the geographical market must do one of two things: either it must make a bona fide offer to sell the franchisor's interest to the dealer, 15 U.S.C. § 2802(b)(2)(E)(iii)(I), or if the franchisor offers to sell two or more of its outlets to another franchisor, it must ensure that the proposed purchaser offers the dealer a "nondiscriminatory" franchise-i.e., a new franchise agreement on the same terms as offered to the purchaser's existing dealers, 15 U.S.C. § 2802(b)(2)(E)(iii)(II).

*Avramidis v. Arco Petroleum Prod. Co.*, 798 F.2d at 13–14 (internal footnotes omitted).

■ The PMPA is a remedial statute and thus "merits a relatively expansive construction." *Seahorse Marine Supplies v. P.R. Sun Oil Co.*, 295 F.3d 68, 73–74 (1st Cir.2002) (citing *C.K. Smith & Co. v. Motiva Enters.*, 269 F.3d 70, 76 (1st Cir. 2001)). The Act operates as a sequential roadmap which provides the franchisor, the franchisees and the court with comprehensive step-by-step Congressional footprints geared to protect franchisees from possible abuses of potent franchisors, while also protecting the latter's rights in the marketplace. Ambiguities are rare in the detailed wording of this legislation. With this in mind, I address plaintiffs well-defined arguments as presented in their post-trial memorandum filed on October 9, 2008. (Docket No. 90.)

### Esso's Announcement of Departure

There is no doubt that Esso has decided to discontinue marketing gasoline in the Puerto Rico geographical area and terminate the Esso franchise agreements. On or about March 17, 2008, Esso notified each of the plaintiffs "that effective September 30, 2008, Esso has decided to terminate and hereby terminates" the franchise agreements entered into with each of the plaintiffs. The reason given by Esso for terminating the franchises was that it was withdrawing from the marketing of motor fuel through retail outlets in Puerto Rico. Because of the scheduling of the evidentiary hearings, Esso reluctantly extended the termination of the franchise

agreements for 30 days. In order not to let the sale agreement between Total and Esso fall apart, Total acceded to the extension granted to the prospective franchisees who now run Esso gasoline service stations. With the evidence presented during the evidentiary hearing, and considering the affidavits in the record, I conclude that no successful attack has been made on the motive behind Esso wishing to leave the geographical area after 118 years and there is no evidence to reflect that the decision to terminate is anything other than a bona-fide business decision. *See* 15 U.S.C. § 2802(b)(2)(E).

■ Plaintiffs stress that Esso acted in bad faith because, among other things, it entered into franchise agreements after it made the determination to leave the market. Plaintiffs argue this is indicative of the fact that Esso as franchisor did not act in good faith when it terminated the franchises. In *Massey v. Exxon Corp.*, 942 F.2d 340, 346 (6th Cir.1991), the court noted that "it would be clear evidence of Exxon's bad faith if the company entered into new franchise agreements knowing it was doing so simply so it could immediately cancel those agreements." In this case, however, these particular Esso agreements were not cancelled but were honored by Total Petroleum. Even more important, the franchisees who entered agreements after March 7, 2008 were notified of Esso's intentions and were given the same letter that the current Esso franchisees were given. I take the case of Francisco Huertas–Román.

Mr. Huertas–Román's trial franchise contract was entered into on May 1, 2007 and expired in May 2008. Trial franchisees are one-year terms or less. 15 U.S.C. § 2803(b)(1)(C). Along with the other dealers, he received notice of termination of market withdrawal in March 2008. He testified that a three-year Esso contract was signed in May 2008 (two months after he was informed Esso was leaving). He has no copy of the contract although he signed it. In this highly charged business atmosphere, the best evidence of any terms of a contract offered to him would be the contract and the explanation for his not having the contract does not substitute the same. Otherwise, he has, as he said, a month-to-month contract with Esso.

Again, plaintiffs have stressed that Esso cannot avail itself of the market withdrawal defense as to all franchisees if it has illegally terminated one franchisee. In this case, Esso has arguably illegally terminated Enid Fonseca–Marrero, Francisco Huertas–Román and Mece Investment. Plaintiffs rely on *S. Nev. Shell Dealers Ass'n v. Shell Oil Co.*, 725 F.Supp. 1104, 1111 (D.Nev.1989), to support its argument. In that case, one franchisee continued to operate beyond the announced termination date. Thus the market withdrawal defense was not available because Shell had not in fact withdrawn from the market area. Mr. Huertas–Román has a month-to-month contract with Esso. If he was given a three-year contract in May, having had notice that Esso was leaving in September, that does not make the termination illegal. His probationary period had expired in May 2008. Assuming that Mr. Huertas–Román was offered a three-year Esso contract at the food court in Plaza Hatillo, the only reasonable explanation for the offering was to place Mr. Huertas–Román in the same position as other Esso dealers. Thus Total would then offer him a contract to continue operation as a Total dealer. Otherwise I would have to believe that an act of rote munificence would operate to undo everything Esso has been doing since March, and require Esso to remain in Puerto Rico or seek a reason other than market withdrawal to terminate the other franchise contracts.

Edgar Dávila–Oliveras, representative of the Mece Investment, is not currently operating a gasoline station pending government permits. The corporation received notice of termination along with the rest advising termination effective September 30, 2008. Mece was also offered a Total contract.

Ms. Fonseca–Marrero received a trial franchise signed before the notice of termination with an effective date of her lease being March 15, 2008. No letter of termination was sent to her husband because she is the dealer of record.

The allegations of evil deed or subterfuge are lost in the candid communications from Esso to its recently acquired franchisees who clearly made a business decision with the knowledge of Esso's departure and the expected acquisition of Esso's assets by Total. Therefore, Esso did not act in bad faith in terminating franchises after it made a determination to withdraw from the Puerto Rico market.

### Burden of Proof

Title 15 U.S.C. § 2805(c) provides that once the franchisee establishes that the franchise has been terminated or that it has not been renewed, "the franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under" the Act. 15 U.S.C. § 2805(c); *see also Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.*, 940 F.2d 744, 748 (1st Cir.1991). This means that Esso must ultimately show (to paraphrase the statute) that Total Petroleum Puerto Rico Corp. offered "in good faith, a franchise to the [plaintiffs] on terms and conditions which are not discriminatory to the [plaintiffs] as compared to franchises then currently being offered by [Total] or franchises then in effect and with respect to which [Total] is the franchisor." 15 U.S.C. § 2802(b)(2)(E)(iii)(II). In accordance with *Avramidis v. Arco Petroleum*

*Prod. Co.*, 798 F.2d at 14, Esso must ensure that the proposed franchisor offers a non-discriminatory agreement. Esso did not do that, before or after the offer. Mr. Trujillo knew nothing of the Total terms until the injunction hearing. Esso relied on the reputation and strength of Total in the market and candidly did nothing to assure the presence of those required non-discriminatory terms. It proceeded to trust Total as a matter of faith while attempting to comply with a statute the central premise of which is distrust. This commercial myopia does not, however, doom the franchisor if the offered terms are ultimately nondiscriminatory as defined in the statute. Thus, this leads to the second threshold question, ominous in its own right, and that is whether notice has been sufficient under the PMPA for Esso to invoke that element of the affirmative defense.

### Notice

Plaintiff takes issue with Esso's compliance with the comprehensive statutory requirement of notifying not only the franchisees but also the Governor of Puerto Rico, (and the details of such notices), of its intention to withdraw from the marketing of motor fuel through retail outlets in the relevant geographical area, in this case, Puerto Rico. *See* 15 U.S.C. § 2804(b)(2). The manner of notification requires that the same be in writing, posted by certified mail or personally delivered to the franchisee. As pertinent, the statute reads,

(c) Manner and form of notification

Notification under this section—

1. (1) shall be in writing

(2) shall be posted by certified mail or personally delivered to the franchisee; and

(3) shall contain-

(A) a statement of intention to terminate the franchise or not to renew the

franchise relationship, together with the reasons therefor;

(B) the date on which such termination or nonrenewal takes effect; and

(C) the summary statement prepared under subsection (d) of this section. 15 U.S.C. § 2804(c)(3). The statute requires strict compliance, which does not cede to the selectivity of the franchisor. *See, e.g., Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co.*, 295 F.3d at 77–78. As plaintiffs clearly point out, failure to follow the rules leaves the franchisee without clear notice. *Id.; see also Marcoux v. Shell Oil Prod. Co.*, 524 F.3d 33, 40 (1st Cir.2008), *petition for cert. filed*, 77 U.S.L.W. 3106 (U.S. Aug. 21, 2008) (No. 08–240) and (U.S. Sept. 19, 2008) (No. 08–372). Plaintiffs assert Esso was not in compliance with the notice requirement, specifically citing the summary statement, the appendixes to the Governor's letter and the "plan describing the schedule and conditions under which the franchisor will withdraw from the marketing of motor fuel through retail outlets in the relevant geographic area, to the Governor of each State which contains a portion of such area." 15 U.S.C. § 2804(b)(2)(B). They also contend that not all franchisees were properly served under the PMPA. Esso counters that these unserved "franchisees" were not franchisees at all under the original franchise agreements, which, it argues, are controlling. Plaintiffs, however, rely on Esso's answer to the complaint and the wording of the counterclaim referring to plaintiffs as franchisees.

■ Esso has argued that the franchisee is defined or described in the franchise agreement. Plaintiffs wished to impeach the president of Esso, Mr. Trujillo, with the statements in the answer and counter-claim, but were not allowed to do so. That the pleadings refer to the spouse and conjugal partnership as franchisees does not create the PMPA relationship between franchisor and franchisee. The franchise agreement governs and the court would be hard-pressed to create an unfounded relationship through judicial admission. Regardless of the admission by Esso in its answer to the complaints that plaintiffs are franchisees, in this case, such an erroneous admission is not fatal to the PMPA notice requirement. As to the strict notice requirement in terms of summary statement, an otherwise proper notice cannot be considered invalid if the summary statement is excluded. "The original trial franchise agreement between plaintiff[s] and [the franchisor] included a reference to the PMPA, and there is no indication that plaintiff[s] [were] prejudiced by the lack of a summary statement." *Amadeo v. Mobil Oil Caribe, Inc.*, 642 F.Supp. 962, 964 (D.P.R.1986); *see Brown v. Magness Co.*, 617 F.Supp. 571, 574 (S.D. Tex. Galveston Div.1985). This makes sense since Esso has made it clear that it was withdrawing from the market in accordance with the PMPA. *See, e.g., Grotemeyer v. Lake Shore Petro Corp.*, 749 F.Supp. 883, 888–89 (N.D.Ill.1990). As portentous as form may be in the PMPA, it should not prevail over substance. *Cf. Desfosses v. Wallace Energy, Inc.*, 836 F.2d 22, 26 (1st Cir.1987) (referring to notice under 15 U.S.C. § 2802). Plaintiffs argue that only evidence of the Governor's letter was produced and no more. In one sense, they are correct. Esso has not presented in court and has not introduced into this record copies of the termination letters which were attached to the Governor's letter.[17] No letter presented in evidence described the schedule and conditions of Esso's de-

**17.** Plaintiffs emphatically objected to the introduction of the Governor's letter, Exhibit E, in that it was incomplete. Fed.R.Evid. 106 & 1002. The objection was not sustained, and I stated in court, "It is what it is."

parture from the market. In another sense, Mr. Trujillo testified regarding the letter (Exhibit E), which clearly reflects a meeting with the Governor as well as with representatives of Total on March 10, 2008. The letter also makes reference to copies of the termination notices to all Esso franchisees. The letter also makes specific reference to Esso's complying with the PMPA and the requirement that the franchisees be given notice that effective September 30, 2008, Esso would cease its branded fuel distribution operations in Puerto Rico, with the addition that it was attempting a smooth transition of its operations to Total. See Ex. E. It appears that the required summary statement was not presented or if it was, it was not mentioned. This omission is not fatal to the requirement of notice upon the Governor regarding the termination. Nevertheless, this does not put to rest the issue of sufficient notice upon the franchisees. Indeed, plaintiffs argue that Esso has not proven that it has properly served notice upon all of its franchisees. In at least one case brought up during the hearing, the Esso franchise contract mentions the conjugal partnership as franchisee. Ex. 16 (sublease agreement). The franchisee is Sociedad de Bienes Ganaciales, (Spanish for Conjugal Partnership), composed by Julio C. López–Rodríguez and Carmen H. Mercado–Reyes, both of age, property owners, subleasees, or retailer. Exhibit 18 is an Esso sublease agreement identifying the partnership composed of Sixto Pabón–García, Santos Pabón–García, and José Antonio Pabón–García of Guayama and Patillas, as dealers.

 Within the second threshold question is whether service of the notice of termination as required under the PMPA is sufficient if performed in person and by certified mail, upon a member of the conjugal partnership or a partnership, or if service of notice of termination must be made upon both members, and separately upon

one of them as representing the conjugal partnership. The PMPA is not a one-sided statute and within its remedial nature and liberal context, it would be difficult to discern that notice to the left hand would be insufficient to impute notice to the right. In Puerto Rico, separate notice is not required to both the husband and the wife, who are both members of the conjugal partnership. See González–Álvarez v. Rivero–Cubano, 426 F.3d 422, 429 (1st Cir.2005) (citing Blas v. Hosp. Guadalupe, 146 D.P.R. 267, 304 (1998)). Relying on Puerto Rico law to reach a solution does not do damage to the preemptive language of the PMPA. Cf. Brach v. Amoco Oil Co., 570 F.Supp. 1437, 1442–43 (N.D.Ill.E.D.1983). Thus serving one member of a partnership suffices to serve all, particularly in a closely-knit, family setting. The PMPA notice provisions mandate strict compliance. This is strict enough to comply with the spirit of that mandate.

All of the witnesses, including some plaintiffs, testified that the franchisee received notification from Esso on March 17, 2008 announcing the termination of their franchise agreement because Esso was leaving the market. Most of them testified that they received offers from Total that would allow them to continue to operate the gasoline service stations at the current locations. In comparing the testimonies of Mr. Trujillo and Mr. Vigil with those of plaintiffs, and reviewing the exhibits, I conclude that most of the plaintiff-franchisees received adequate notice of the termination of the Esso franchise agreement. However, there are plaintiffs who did not receive sufficient notice under the PMPA according to them.

*Notice to Pabón*

 Three brothers, Sixto, Santos and José A. Pabón–García, composed a partnership which had an Esso franchise

agreement which was terminated like the others. See Ex. 18. However, while one of the three members of the commercial partnership was notified by Esso under the PMPA, only one brother was actually offered a franchise, and not the three in partnership, as they appear in the franchise agreement with Esso. This is clearly a violation of 15 U.S.C. § 2802(b)(2)(E)(iii)(II) since under the terms of the PMPA, the Total offer had to be made to all three, even if one was notified as representative of the others. *See, e.g., Hoai v. Superior Court,* 473 F.Supp.2d 75, 79–80 (D.D.C.2007).

### Notice to Julio C. López–Rodríguez

■ Esso originally had a franchise contract with Julio C. López–Rodríguez and Carmen H. Mercado–Reyes. While the conjugal partnership is the Esso franchisee, only Mr. López was offered the Total franchise. This is also clearly a violation of 15 U.S.C. § 2802(b)(2)(E)(iii)(II) in that Total did not offer a franchise contract to the complete Esso franchisee. *Cf. Iannuzzi v. Exxon Co., U.S.A.,* 572 F.Supp. 716, 722–23 (D.N.J.1983).

### Did Esso Identify the Person Who Bought its Assets?

Plaintiffs argue that Esso cannot use the market withdrawal defense under 15 U.S.C. § 2802(b)(2)(E) unless it proves the identity of the purchaser who bought its assets so that the court can determine whether the purchaser has made an offer of a franchise to its franchisee. *See Ewing v. Amoco Oil Co.,* 823 F.2d 1432, 1438 (10th Cir.1987), *cited with approval in Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.,* 940 F.2d at 749 & n. 3. They argue that there was no testimony in the record to show the identity of the purchaser of Esso's assets, making reference to the Board of Directors' resolution approving the sale of assets which omits the name of the purchaser of the assets. Thus

their conclusion that Total was not the purchaser of the assets.

Mr. Vigil was Total Puerto Rico's marketing director for four years, until two months ago. He testified that both the Total Puerto Rico general manager, Philippe Corsaletti, and the financial director, Nicolás Moragues, participated and were involved in the Esso offer. In vague terms, he noted that due diligence was involved purchasing the assets from Esso, and that the due diligence began before Esso accepted the offer from Total. He did not know the person at Total who made the offer to purchase the Esso assets. He was aware that an offer was accepted for the purchase of Esso assets, and he then received the tasking at some point to offer the standard franchise contract.

If plaintiffs are correct and there is no testimony to identify the identity of the purchaser of Esso assets, then both Total and Esso may be violating the PMPA while misleading the court and the franchisors. All of Total's pleadings identify it as the purchaser of Esso's assets, thus their intervention, as well as their being named defendants. The purchaser of the assets is operationally defined by the actions of Total's agents and the Total offering letters and contracts. This is a non-issue.

### Did Total Petroleum Make a Valid Offer of a Franchise?

Plaintiffs argue that a franchisor cannot use the market withdrawal defense under section 2802(b)(2)(E) unless it proves that the purchaser of its assets made a valid offer of a contract: if the offer is illegal, or does not otherwise constitute an offer of a contract, the franchisor's defense fails as a matter of law. *Avramidis v. Atlantic Richfield Co.,* 623 F.Supp. at 67. However, while the terms offered by Total to the prospective franchisees do not have to mirror the franchise contract terms they may

have had with Esso, the terms must not prove discriminatory when compared to terms being currently offered to prospective Total franchisees. That rental prices and quotas may vary with geographical location within Puerto Rico does not present a discriminatory condition. *See, e.g., Ewing v. Amoco Oil Co.,* 823 F.2d at 1438; *Pearman v. Texaco, Inc.,* 480 F.Supp. 767, 771 (W.D.Mo.1979). Indeed, plaintiffs must somehow show that Total's offer was not done in good faith. That Total offers the franchisees the franchise agreements on a "take-it-or-leave-it" basis is a business decision, good or bad, right or wrong, which the court cannot supervise, alter or question, as long as such a decision is devoid of bad faith. *See Massey v. Exxon Corp.,* 942 F.2d at 344–45; *Coast Village, Inc. v. Equilon Enter., LLC,* 163 F.Supp.2d 1136, 1148 (C.D.Cal.2001); *S. Nev. Shell Dealers Ass'n v. Shell Oil Co.,* 725 F.Supp. at 1109; *cf. Jet, Inc. v. Shell Oil Co.,* 381 F.3d 627, 630 (7th Cir.2004).

*Non-discriminatory Terms*

Esso did not independently review the franchise contracts being offered by Total, or for that matter, since the offering. The legislative scheme must certainly require some responsibility and certainly accountability by Esso for complying with the requirement to ensure Total's terms also comply with the statutory mandate. Nonetheless, the statute requires those terms from the offering franchisor, and those terms are the results of business decisions, in this case, terms which Total offers in its standard franchise agreement. Aside from the argument raised at the end of Mr. Vigil's testimony, there is no evidence that Total wants to actually force any prospective franchisees out of the business, or out of the geographical area of the service station or out of the actual property if leased. That the terms of the offered contracts may vary dramatically from the terms of the Esso franchise contract is not of consequence under the PMPA because the comparison related to discrimination is not made between Esso and Total but rather is made between offered franchise contracts and existing Total franchise contracts. Terms may vary due to location and situation of convenience store and owner operated or non-owner operated, and Total terms may not seem as favorable as previous Esso terms. The terms offered must be similar not identical to those offered to other Total franchisees. *See Unocal Corp. v. Kaabipour,* 177 F.3d 755, 767 (9th Cir.1999); *S. Nev. Shell Dealers Ass'n v. Shell Oil Co.,* 725 F.Supp. at 1109. In some cases at least, the rent terms for the next three years appear more favorable under Total's franchise but if the contrary were true, the presence of discriminatory terms would not be the *a fortiori* conclusion.

During the cross-examination of Mr. Vigil, I sustained an objection to a question brought to show bias or prejudice, the subject matter being the franchise contracts offered to the plaintiffs who withdrew their request for preliminary injunction a few days ago in order to continue operating as franchisees but as Total franchisees under the same terms they have with Esso. The issue is clear. Are the franchise agreements offered to those plaintiffs discriminatory when compared to the franchise agreements previously offered to Total franchisees? The answer is not obvious. However, to title those agreements *discriminatory* when compared to the ones originally offered by Total defeats the purpose of the PMPA rather than supports the same. I explain. As Esso pointed out at side-bar, aside from a Rule 408 objection, the cause of action arises from actions occurring before the filing of the complaint. I am searching for an equitable remedy at this time and the agreement between Total and the plaintiffs who have withdrawn their request for a preliminary injunction have provisionally

resolved an impasse. As a result, the plaintiffs yet seeking injunctive relief argue they have been discriminated against. However, those have rejected the offer which was given by Total across the board. The concept of fairness is not lost at this stage and while the remaining movants may be unhappy with the Esso–Total agreement, they cannot plead discrimination when they have not suffered such discrimination as contemplated, except for the reason that they refused the better terms offered to all franchisees, a refusal they are perfectly in their rights to exercise when they did. At that moment, the terms offered were not discriminatory, and at present, the terms may appear discriminatory following the false postulate *"post hoc, ergo proper hoc"*. The movants' agreements did not become discriminatory by the subsequent agreements reached between plaintiffs in Civil 08–2025 and 08–2044 and Total. Thus the remaining movants have not been discriminated against.

There is no information that the import of the Total franchise agreements is to force any franchisee to reject the proposal or that there are any prospective non-Esso franchisees waiting above the wings *deus ex machina* to take over a franchise. Seventeen Esso franchisees had accepted the Total contract before the litigation. However, the inquiry does not stop there.

Aside from what they consider certain draconian terms, plaintiffs have raised issues of legality of some of the terms of the Total franchise contract. The proposed Total terms are not subject to court-ordered modification at this time. *Cf. Broadley v. Mashpee Neck Marina, Inc.,* 471 F.3d 272, 275 (1st Cir.2006). This is particularly true since plaintiffs have not accepted the franchise offer and the tack of this discussion focuses on the quality of the terms vis-a-vis state law and the PMPA. Esso franchisees may be offered a contract with the *proviso* that they can take-it-or-leave it, or subsequently negotiate terms. The Total contract might be considered similar to an insurance or employment contract where the terms reflect a great inequality in the bargaining powers of each party, such as in contracts of adhesion. *See Esso Standard Oil Co. (Puerto Rico) v. Monroig–Zayas,* 445 F.3d 13, 15 (1st Cir.2006); *cf. Cherena v. Coors Brewing Co.,* 20 F.Supp.2d 282, 285 (D.P.R. 1998). The question remains whether the Total contract contains terms that are clearly illegal under state law, in which case, those terms arguably cannot be excised from the contract but would rather render the contract null and void. It would tax credulity to believe that Total would knowingly offer a contract with illegal clauses which would nullify the whole, particularly when it is attempting to secure an added 10% of the gasoline retail market. At very least, a conclusion that there are senseless illegal terms in the offered contract would cast a pall on Total's non-discriminatory argument.

■ Plaintiff argues that a valid offer of a contract exists only if the contract offered complies with the following provisions imposed by Article 1213 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 3391(1) the offer must have a definite price. The offer must have a definite object. If the object lacks a definite price or a definite object, it is not a valid contract. P.R. Laws Ann. tit. 31, § 3391(2).[18] A contract that grants one of the parties the power and authority to determine the va-

---

18. P.R. Laws Ann. tit. 31, § 3391 reads:
 Requisites of contract
 There is no contract unless the following requisites exist:
 (1) The consent of the contracting parties.

(2) A definite object which may be the subject of the contract.
(3) The cause for the obligation which may be established.

lidity and enforceability of the contract is null and void, and contrary to law. P.R. Laws Ann. tit. 31, § 3373.[19] "[Title] 15 U.S.C. § 2805(f)[ ] prohibits a franchisor from requiring, as a condition of entering into or renewing a franchise relationship, a franchisee to release or waive any right protected under the PMPA, any other federal law, or under any valid state law." *Coast Village Inc. v. Equilon Enter., LLC,* 163 F.Supp.2d at 1178 (citing 15 U.S.C. § 2805(f)(1)(B)). Plaintiffs cite *Avramidis v. Atlantic Richfield Co.,* 623 F.Supp. at 67, where the court considered granting a temporary injunction because of a "sufficiently serious question" under 15 U.S.C. § 2805(b)(2)(A)(ii). Most importantly: "That [franchisor] reserves the right to vary the rents it charges in accordance with some type of VRP is not in itself defective, see *Corbin on Contracts,* § 98, but the failure to specify how the rent will be reduced does appear to render the offer invalid." *Avramidis v. Atlantic Richfield Co.,* 623 F.Supp. at 67. Plaintiffs point out that Exhibit F2, articles 4.1 and 4.2 permit Total to unilaterally increase the rent at its pleasure, terms which are in direct violation of Department of Consumer Affairs Rental Regulation Number 2823, effective October 8, 1981, which recognizes and affords the retailer the right to negotiate the rent to be charged for the service station and the rent cap established. Plaintiffs argue that the regulation is not preempted by the PMPA, citing *Esso Standard Oil Co. v. Dep't of Consumer Affairs,* 793 F.2d 431 (1st Cir.1986). The district court in that case decided that the PMPA did not preempt the Commonwealth's rent-control regulation. *Esso Standard Oil Co. (PR) v. Dep't of Consumer Affairs,* 622 F.Supp. 540 (D.P.R. 1985). It is beyond peradventure that

franchisors must be free to respond to market conditions, i.e., raise rents if the market will permit. *Esso Standard Oil Co. v. Dep't of Consumer Affairs,* 793 F.2d at 435. At the same time, franchisees clearly have recourse to state law which reduces the franchisor's flexibility. This clause in Total's proposed franchise agreement does not render the agreement invalid, not because it can be severed, but because Total agrees in the same contract that the contract is to be interpreted in conformity with the laws of the Commonwealth. *See, e.g.,* Ex. 12 (lease agreement), at 22, Art. 19.1. *Cf. Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co.,* 295 F.3d at 71. Furthermore, the standard Total contract is universal, *mutatis mutandis,* and recognizes required changes not only in the market but in the applicable state or jurisdiction. Thus, for example, if Total were to notify the franchisee that it was raising the rent by 20% and the DACO regulation prohibits such an increase, negotiations having failed, the franchisee could seek recourse to the regulatory body relying not only upon its regulation but upon the legitimacy of clauses in the franchise agreement. Those clauses include the one stating which law will govern in interpreting the agreement. In relation to another argument of the franchisees related to the goodwill and deprivation of the same by the franchisor, Total's position, as stated in its universal model, is that it is the owner of the goodwill, and its formula protects the franchisee's original investment as well as its own interest in its brand. The ultimate issue arises upon sale of the on-going business and if state law is contrary to the terms of the franchise agreement, the law prevails. Total agrees to this, notwithstanding the testimony that terms are not negotiable.

19. P.R. Laws Ann. tit. 31, § 3373 reads:
The validity and fulfilment of contracts cannot be left to the will of one of the contract-

ing parties.

While they remain unnegotiable, in a nutshell, they cannot be enforced above the law. No one disputes that. Finally, if other property rights are affected by a clause of the franchise agreement which is not negotiable, that too is subject to the interpretation of state law.

*Remedy*

Under the Petroleum Marketing Practices Act, a court

shall grant a preliminary injunction if—

(A) the franchisee shows—

(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and

(ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

15 U.S.C. § 2805(b)(2).

■■ A plain reading of the statute reveals a departure from the traditional common law standard for injunctive relief as well as a departure from Rule 65 requirements. *See Avramidis v. Arco Petroleum Prod. Co.,* 798 F.2d at 14. The Act, clearly remedial in nature, focuses upon the prevention of abuses from a powerful franchisor and a not so powerful franchisee. *See C.K. Smith & Co. v. Motiva Enters.,* 269 F.3d at 73. Reflecting that concern, Congress eased the standard for injunctive relief to maintain the status quo, and made it more liberal than the stringent common law requirement of making a strong showing of probably prevailing on the merits. *See Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1216–17 (7th Cir.1984); *Corbin v. Texaco, Inc.,* 690 F.2d 104, 105–06 (6th Cir.1982). What is and is not a sufficiently serious question may very well be subject to serious debate and the definition may be hazy. And the balancing of hardships would also have given pause.

Appearing plaintiffs or their representatives testified that they will suffer individual hardship. They generally argue that by losing their Esso franchises, they will lose the full value of their investments in the stations and franchises, particularly under the 60–40 Total clause. They argue that the mere loss of a franchise is irreparable harm. On the other hand, depriving Esso of its ability to terminate plaintiffs' franchises more than merely causes Esso to lose an incremental increase in the income it presently receives. The decision to leave a market after 118 years is not a knee-jerk decision.

Plaintiffs proffered and defendants concurred that if the remaining plaintiffs who more than filled the courtroom and did not testify would testify, in relation to the element of hardship they would relate the following: uncertainty related to the gasoline in terms of its being branded or unbranded, catastrophic consequences if they accept the Total offer, serious injury, and damage to reputation. This being said, the question remains whether the terms of the contract being offered are similar to other being offered and that they do not reflect a discriminatory animus on the part of Total in relation to the acquired Esso franchise dealers. Dissatisfaction with a business deal is one of the natural consequences of a sale of assets of one franchisor to another. The details of satisfaction of the contractual terms do not rely on the PMPA for enforcement but rather on elements of contract law in Puerto Rico, law with which the Total franchise agreement must comply.

Mr. Torres–Caratini found the Total agreement disastrous and that the terms would be like Total is running the gas stations. Ms. Viera–Lourido complained of the ugly delivery trucks and the complaints from her family and customers regarding the quality of the new gasoline delivered. Mr. Rodríguez–Quiñones had similar complaints, as did Ms. Colón. Mr. Huertas–Román has a month to month agreement and has not received a contract. Mr. Dávila–Oliveras complained of the lack of attention by Esso to improvements for his blighted Esso station. Mr. Carrasquillo–Rodríguez had a severe water problem in his tanks with the new gasoline. Mr. Hernández–Serrano complained about the 60–40 clause as did other franchisees, including Mr. Gierbolini and Mr. Martínez–Feliciano. Indeed, Mr. Gierbolini said he would close the business. In his case, he paid $100,000 for the "key" ("la llave") money, and would realize an instant loss if he were to sell as a Total franchisee. Mr. Cortés–Mercado and Mr. Pabón–García did not testify in relation to hardship. Mr. Lebrón–Otero complained about the new rent, among other complaints. Ms. Hernández–Vélez complained about the terms of the Total contract related to her convenience store. Mr. Vega–Arce also complained about the Total contract's relation to convenience stores and the property, noting that they survive because of the store since they do not earn so much from the gasoline sales.

Plaintiffs argue in their post-trial memorandum that they are entitled to punitive damages based upon the terminated franchises, and the stipulated causation of catastrophic injuries to each plaintiff. While the stipulation provided for what the witnesses would testify, it did not provide that the termination has caused and threatens to cause such catastrophic damages. Rather, Esso objected and the stipulation remained that such would be plaintiffs' testimonies were they to have testified.

There are complaints of improper debranding but aside from the smaller sign being removed during the transitional phase, the Esso ovals remained.

This being said, certain plaintiffs invite me to consider the motion for injunctive relief under the more liberal PMPA standard. (Docket No. 109, filed October 15, 2008.) However, the matters of preliminary and permanent injunction having been consolidated, the relaxed standard no longer applies. That the matter will be resolved on the merits is beyond dispute. The question is whether a permanent injunction will issue.

The great majority of plaintiffs have not prevailed on the merits of their claims. For those that have shown a violation of the PMPA, there has not been shown irreparable injury. Even if all plaintiffs were ultimately to prevail, their injuries, while not easily determined, are capable of adequate redress. A weighing of the hardships favors Esso at this time, since the harm to it, considering its uncontradicted motive for leaving Puerto Rico, would exceed the harm to the prevailing franchisees left out of the Total offers. Finally, the public interest would be adversely affected if an injunction were to be issued, considering for example elements of pricing and safety, as well as consideration of a free market economy.

In light of the above, the request for injunctive relief is denied. Esso has complied with the notice requirements under the PMPA, and Total's offering of nondiscriminatory franchise contracts generally complies with Esso's obligation to assure that its franchisee is offered a non-discriminatory contract, save for Total's failure to make franchise offers to franchisees José Antonio Pabón–García, Sixto Pabón–García, and Carmen H. Mercado–Reyes.

Contrary to the arguments of Esso and Total, the failure of Total to have offered

to certain Esso franchisees, (as defined in the Esso franchise agreement), a nondiscriminatory contract, is more than a technical violation of the Act. While a partnership or conjugal partnership in Puerto Rico may be served with notice of termination through one of its partners, the same concept does not hold true when, for example, one of the Pabón–García brothers, Santos, is offered a Total franchise, and the other two, José Antonio and Sixto, former Esso franchisees through said partnership, are left out in the cold. The same holds true for an offer to one member of a conjugal partnership, Julio C. López–Rodríguez, while his partner, Carmen H. Mercado–Reyes, is also excluded. Whether by design resulting from company policy, or inadvertent error, the offer was not made. I decline the invitation of Esso to instruct Total to include the missing partners in the offerings. That suggested solution is not equitable but rather contractual, and neither Esso nor this court can modify the Total offer. Thus, Esso could not have complied with its obligation to assure that its franchisee was offered a nondiscriminatory contract by the successor franchisor, as required under the Act. Consequently, a hearing is required to determine damages against Esso in relation to those franchisees not adequately offered a nondiscriminatory contract under the Act. *See* 15 U.S.C. § 2805(d)(1)(A).

Having denied the request for injunction as to all plaintiffs, an award of money damages to the excluded Pabón brothers and Carmen H. Mercado–Reyes is appropriate.

I have considered the arguments raised in plaintiffs' terse opposition to my previous order denying injunctive relief. (Docket No. 117, dated October 17, 2008.) While aware that equity paints with a broad brush and I can fashion relief on a mural, I have deferred to the pen, for the reasons stated within this opinion and order.

A hearing on damages will be scheduled in relation to the claims of Sixto and Santos Pabón–García, and Carmen H. Mercado–Reyes, members of partnerships who were left out of the Total offering.

At the evidentiary hearing, many exhibits were introduced in their original Spanish language although pertinent parts were translated into English. If there is an objection to the translation of any Spanish word I have referred to, parties are to assure that I am given the opportunity to correct the same before further review, if any, is sought.